Edwin A. Quinn, trustee,[1] vs. Rent Control Board of Peabody; Donna Rosanno & others,[2] interveners (and three companion cases[3]).

Nos. 96-P-1563, 96-P-1587, 96-P-1603 & 97-P-36.

Essex. March 10, 1998. - August 27, 1998.

Present: Kass, Kaplan, & Laurence, JJ.

*Mobile Home. Manufactured Housing Community. Municipal Corporations,* Rent control. *Rent Control,* Mobile home, Rent increase, Recalculation of rent levels, Judicial review. *Housing Court,* Jurisdiction. *Statute,* Construction. *Constitutional Law,* Rent control, Contract clause, Taking of property. *Attorney General. Consumer Protection Act,* Unfair or deceptive act. *Uniform Procurement Act.*

A judge of the Housing Court acted within his authority in remanding to a municipal rent control board an action seeking to correct allegedly illegal rent increases imposed by the board on occupants of a mobile home park. [370-371]

This court concluded that St. 1987, c. 302, amending St. 1976, c. 131, was self-enacting and did not require local adoption to be effective. [371]

The declaration in St. 1976, c. 131, of a housing emergency in response to a home rule petition carried over to an amendment to that statute effected by St. 1987, c. 302. [371-372]

Owners of certain mobile home parks did not demonstrate that St. 1987, c. 302, operated to impair any contracts in violation of art. I, § 10, cl. 1, of the United States Constitution [372-373], nor did those statutory provisions that regulated permissible rents in those mobile home parks constitute any manner of unlawful taking of property [373-375].

General Laws c. 40P, the Massachusetts Rent Control Prohibition Act, by its own terms does not apply to mobile homes and thus to mobile home parks. [376-377]

---

[1]Of Red Hill Trust.

[2]The interveners are tenants of Red Hill Estates Mobile Home Park, owned by the plaintiff.

[3]Hilda Kapamagian *vs.* Rent Control Board of Peabody; Donald Perry & others, interveners (Superior Court). Commonwealth *vs.* Rent Control Board of Peabody & others; Mobile Estates Tenants' Association, Inc., intervener (Housing Court). Mary Jane Welch & others *vs.* City of Peabody & others; Welch Mobile Home Villa Tenants' Association, Inc., & another, interveners (Superior Court).

A Superior Court judge correctly concluded that a rent control board member's hold over, after his term expired and until his successor was appointed, did not operate to invalidate any rent determinations he participated in during that period. [377-378]

Substantial evidence supported a determination of a municipal rent control board setting the appropriate rental rates of a mobile home park, and the board did not act arbitrarily or capriciously. [378-379]

Mobile home park owners did not demonstrate that G. L. c. 140, § 32L(8), the Manufactured Housing Act, was not a valid regulation in response to a legitimate State interest or that there was no rational basis for the State to treat them differently from other landlords. [379-380]

There was no merit to claims of owners of certain mobile home parks that the Attorney General was without authority to commence civil proceedings in the public interest against a municipal rent control board for its violations of St. 1976, c. 131, and St. 1987, c. 302, or against the owners for their failure to comply with St. 1987, c. 302. [380-381]

A Superior Court judge did not err in finding that owners of certain mobile home parks issued discontinuance notices to tenants in good faith, in the ·circumstances, and were not in violation of G. L. c. 140, § 32J(4) [381-383], or that the owners' violations of c. 140, § 32L(8), regarding notice requirements, were only technical [383-384]; nor did the judge err in concluding that the owners' actions did not constitute violations of G. L. c. 93A [384].

A municipality properly hired a hearing officer, pursuant to § 1(b)(15) of G. L. c. 30B, the Uniform Procurement Act, to assist its rent control board in holding hearings in certain complex redeterminations of rents in mobile home parks after remand by a judge of the Housing Court, and the municipality properly appropriated monies to pay for the hearing officer's services. [384-385]

CIVIL ACTIONS commenced in the Superior Court Department on June 28, 1991, August 16, 1995, March 13, 1996, and May 20, 1996, respectively.

Following transfer of the Commonwealth's case to the Northeast Division of the Housing Court Department, motions for summary judgment in the Commonwealth's case were heard by *David D. Kerman*, J.; following remand to the rent control board of Peabody for rent adjustment hearings and following consolidation of all actions, the cases were heard by *Joseph A. Grasso, Jr.*, J., sitting under statutory authority.

*Donna L. Palermino*, Assistant Attorney General, for the Commonwealth.

*Vincent R. Brogna* for Mary Jane Welch & others.

*Anthony M. Metaxas* (*Joel Rosen* with him) for Edwin A. Quinn.

*David Wm. Adams* for Donna Rosanno & others.

*Thomas C. Regan* for Hilda Kapamagian.

*Daniel B. Kulak*, Assistant City Solicitor, for city of Peabody & another.

*Scott Harshbarger*, Attorney General, *Donna L. Palermino & Chi Chi Wu*, Assistant Attorneys General, for the Commonwealth, amicus curiae, submitted a brief.

KAPLAN, J. The decision of the present appeals, if correct, concludes — it may be hoped — more than ten years of legal uncertainty or controversy about the regulation of rents and other matters affecting mobile home parks in the city of Peabody. We acknowledge that our decision owes much to the careful work of the judges below and especially the judge who presided at the three culminating trials.

## I. *NARRATIVE*

a. *Early legislation.* Mobile home parks have been regulated by statewide legislation since 1939 (see St. 1939, c. 416) and we shall have occasion to refer below to provisions of the long standing Manufactured Housing Act, G. L. c. 140, §§ 32A-32S.[4] Around 1976, however, the city of Peabody experienced a special need for regulation of this subject matter, and, in response to Peabody's "home rule petition," the Legislature enacted St. 1976, c. 131 (1976 Enabling Law). This statute declared that excessive rent increases and resulting threatened

---

[4]The "manufactured housing communities" now spoken of in the statute (G. L. c. 140, §§ 32A-32S, as amended through St. 1991, c. 481, §§ 14-19) were formerly called "trailer camps" (see St. 1939, c. 416, inserting G. L. c. 140, §§ 32A-32E), "trailer coach parks" (see St. 1950, c. 326, §§ 2-8), or "mobile home parks" (see St. 1964, c. 592, §§ 2-14). (We generally use the last term, but refer to the statute by its most recent name.) The owners of these parks are sometimes referred to in the statute as "licensees."

Tracing the evolution of the statute, we see that the park owners have been progressively subjected to more extensive regulation, largely out of a motive to protect the owners of mobile homes (who rent "lots" or "spaces" or "pads" from the park owners) against perceived or supposed exploitation. While lower-income and elderly people can favor mobile homes as an attractive, relatively low cost mode of life, park owners complain about imposed controls of rents, evictions, etc. Tensions mount as park owners think they see a real estate market where they could do better if freed of regulation and able to sell or otherwise use their land.

The instant litigation concerns about 600 of the 775 "lots" in the city of Peabody and about thirty lots in a park in the town of Danvers.

or actual evictions of tenants had resulted in an emergency. The statute empowered the city to establish by ordinance a rent board that would regulate rents for park accommodations and set standards for occupancy of the accommodations and evictions therefrom. The board could make individual or general adjustments of rents to assure owners a fair net operating income (FNOI), defined in St. 1976, c. 131, § 3(a), as

> "that income which will yield a return, after all reasonable operating expenses, on the fair market value of the property equal to the debt service rate generally available from institutional first mortgage lenders or such other rate of return as the board, on the basis of evidence presented before it, deems more appropriate to the circumstances of the case."

Peabody passed its mobile home rent control ordinance, Code of Ordinances of Peabody c. 18, on January 13, 1977, creating a five-member board with stated administrative powers. Under § 18-51, "[t]he maximum rent of a mobile home park accommodation shall be the rent charged the tenant for the month of June, 1976," subject to individual or general adjustments by the board, see § 18-53, observing the principle of attaining levels that would yield the owners FNOI, defined as in the statute.

Eleven park owners attacked the statute and ordinance on constitutional and other grounds but the attack failed, in *Newell* v. *Rent Bd. of Peabody*, 378 Mass. 443 (1979).

b. *Resolution of disputes by contract.* Disputes soon arose about the carrying out of rent adjustments, deepened by concerns that park owners might simply cut off the use of their properties for mobile homes. The Peabody mayor and various park owners and tenant organizations negotiated to stop the squabbling, and in 1981 agreements were reached between some owners, some tenant organizations, and the board which looked to certain fixed increases of rents for individual parks in accordance with the consumer price index (other increases would require specific approval by the board).

By 1984 disputes again erupted: four park owners (not involved in the present litigation), indeed, gave notice that they would discontinue their operations. Now the owners were fighting over which consumer price index was to form the basis of the rent adjustments. The city again attempted to "broker" peace, and the result was contracts reached in the period 1986-

1988 (collectively referred to by the trial judge and herein as the "1986 Agreement") among park owners, tenant organizations (representing majorities, but not all, of the tenants), and the board. A typical contract, after stating that the parties wished to forgo the formal rent adjustment procedures of the ordinance, set a base level rent, provided for a six percent yearly increase, and passed to the tenants some operational expenses (e.g., for rubbish and water) and also increases or decreases in real estate taxes. The parks agreed to remain in operation for a stated period (ranging from six to twelve years), but with a so-called "severability" clause — if the contractually set rents and increases were later deemed improper, then the undertaking to remain in operation would crash.

c. *1987 legislative response.* Again in response to a home rule petition by Peabody, the Legislature, on July 21, 1987, enacted St. 1987, c. 302 (1987 Act), which amended the 1976 Enabling Law in two respects relevant to the present litigation:

(i) The definition of FNOI quoted above was superseded, and, in establishing a FNOI, the board now must consider

> "(1) increases or decreases in property taxes; (2) unavoidable increases or any decreases in operating and maintenance expenses; (3) capital improvement of the housing unit as distinguished from ordinary repair, replacement and maintenance; (4) increases or decreases in living space, services, furniture, furnishings or equipment; (5) substantial deterioration of the dwelling units other than as a result of ordinary wear and tear; and (6) failure to perform ordinary repair, replacement and maintenance."

St. 1976, c. 131, § 3(b), as appearing in St. 1987, c. 302, § 2. In determining whether rents will yield a FNOI, the board may also consider "other relevant factors which the board by regulation may define." St. 1976, c. 131, § 3(b), as appearing in St. 1987, c. 302, § 2.

(ii) To discontinue operations lawfully, a park owner must seek a "discontinuance permit" from the city, following a procedure that involves notice to tenants, public hearing at the board, the board's report and recommendation, and ultimately the vote of the city council. In deciding whether to recommend that the city grant or deny permits, the board "shall consider the aggravation of the shortage of safe, decent and affordable

mobile home park accommodations in Peabody, which may result from the discontinuance, especially for tenants of low and moderate income and handicapped or elderly persons on fixed incomes." St. 1976, c. 131, § 7A(5), as inserted by St. 1987, c. 302, § 3.[5]

The 1987 Act, unlike the 1976 Enabling Law, did not by its terms require approval by the city. The city did not enact an ordinance adopting the new FNOI definition. However, in September, 1991, it did amend its rent control ordinance to incorporate the discontinuance process. Code of Ordinances of Peabody § 18-58 (1991).

d. *Board's 1991 approval of rent increases; Attorney General's lawsuit.* On May 15, 1991, and June 15, 1991, the board approved (effective June 1, 1991) the annual six percent increases pursuant to the 1986 Agreement (as it had done for previous years), and it sent out rent increase notices to the parks' tenants. The tenant representative on the board, Thomas O'Leary, joined in the vote, but he had doubts about the legality of the rent increases and called the Attorney General's office. Upon review of the matter, the Attorney General decided that the contracts were unlawful because, he thought, the board in approving them had abdicated its responsibility to determine FNOI in accordance with the stated factors of the 1987 Act.[6]

On June 28, 1991, the Attorney General, on behalf of the Commonwealth, filed in Superior Court a four-count complaint

---

[5]Section 7A(5), as inserted by St. 1987, c. 302, § 3, requires the board to make findings on the following factors:

"(a) the benefits and detriments to the persons whom this act and this section seek to protect;

(b) the hardships imposed on the tenant residing in the mobile home accommodations proposed to be discontinued;

(c) circumstances demonstrating hardship and inequity to the licensee seeking a discontinuance permit;

(d) the rate of vacancy of mobile home accommodations in the city of Peabody at the time the licensee applies for a discontinuance permit and the average rental rates for said available accommodations;

(e) the availability of land zoned and otherwise suitable for development or expansion of mobile home parks."

[6]Further, the Attorney General believed that the rental increases were in violation of G. L. c. 186, § 12, which (if it applied) would require that the

against the board and nine Peabody mobile home parks,[7] praying injunctive relief to stay the increases just voted by the board. The Commonwealth secured a temporary restraining order on June 28 staying the rent increases until further order. After hearing, a preliminary injunction entered on August 2, 1991, ordering the board to stay the rent increases and the park owners to refrain from collecting rents higher than the May, 1991, rents; the judge, in her rulings of law, said the board had abandoned its duty "in favor of an automatic percentage increase which fails to take into account the factors required by law."

e. *August, 1991, discontinuance notices.* In mid-August, 1991, each defendant park owner (other than Edwin Quinn, owner of Red Hill Park) in the action brought by the Commonwealth gave a notice of discontinuance to the tenants. Thus Mobile Estates on August 14, 1991, wrote to its tenants that it was "fed-up with the meddlesome actions of the Office of the Attorney General," and, as the contract provision for rent increases might be held illegal, the corresponding obligation to keep the park in operation would fail. Accordingly, it gave notice that it intended to discontinue use of its property as a mobile home park effective two years later, on August 31, 1993.

The owners had not applied for discontinuance permits under the 1987 Act because, as they claimed, that statute was not self-enforcing and was not in effect in August, 1991, because the city had not yet adopted it. The two-year hiatus was required, however, on their own view, because of a provision of the Manufactured Housing Act, G. L. c. 140, § 32L(8).[8] The city acted in September, 1991, to amend its rent control ordinance to incorporate the discontinuance provisions of the 1987 Act. Some defendant owners then applied for permits but these were not

mobile home park tenants receive notices of the rental increases thirty days prior to June 1, 1991.

[7]According to the Attorney General's complaint, the nine Peabody parks (there were thirteen in the city) were the ones operating under the 1986 Agreement. One of the nine parks, R Trailer Haven, was sold to park tenants in December, 1994; in October, 1995, the parties agreed to a voluntary dismissal of the action against this park, leaving eight Peabody parks in the action.

[8]In its notice to tenants, Mobile Estates said it would comply with certain "survey" and "relocation" obligations. These referred to forms of assistance to tenants in case of discontinuance as set out in the Manufactured Housing Act, G. L. c. 140, § 32L(7A).

processed officially, in the belief that the pending litigation needed resolution first.

Reacting to the August discontinuance notices, the Attorney General proceeded under the Consumer Protection Act, G. L. c. 93A, § 4: he sent statutory "demand" letters in September, 1991, to the seven Peabody park owners who had issued discontinuance notices, claiming they had sent the notices in "bad faith, for the improper purposes of intimidation and retaliation," in violation of G. L. c. 140, § 32J. The reference apparently was to G. L. c. 140, § 32J(4), as inserted by St. 1975, c. 692, which permitted the termination of tenancies on an owner's "discontinuance in good faith" of use of the land as a manufactured housing community. The c. 93A demand letters also claimed that owners, by issuing the discontinuance notices without following the permit procedures in the 1987 Act, violated the Manufactured Housing Act's § 32L(8).[9] Under § 32L(7), as appearing in St. 1986, c. 317, § 2, the failure to comply with "this section" (which would comprise § 32L[8]) was made an unfair trade practice under G. L. c. 93A, § 2(a).[10] The owners answered the demands with denials, essentially disputing the charges of "bad faith" in the attempt to discontinue and of noncompliance with the notice provision of § 32L(8) (noting especially that no permit procedure existed in Peabody which they could follow before issuing the notices). In September, 1991, the Commonwealth amended its complaint to allege violations of the Manufactured Housing Act, the 1987

---

[9]Section 32L(8), as inserted by St. 1983, c. 283, provided: "A mobile park licensee shall give at least fifteen days written notice, delivered by certified or registered mail to each mobile home park tenant, that the licensee will be appearing before a governmental board, commission or body to request a permit for a change of use or discontinuance of the mobile park. Upon a change of use approved by the governmental board, commission or body, or a change that requires no local governmental permit or permits, the licensee shall give to each mobile home park tenant at least two years written notice, delivered by certified or registered mail, prior to the mobile park licensee's determination that a change of use or discontinuance will occur. The licensee shall disclose and describe in the notice the nature of the change of use or discontinuance."

We will discuss in this opinion whether discontinuances in Peabody in August, 1991, required "local governmental permit or permits" (as in the 1987 Act).

[10]In 1993, § 32L(7) was amended to read that any violation of § 32A through § 32S, inclusive, would violate c. 93A, § 2(a). See St. 1993, c. 145, § 12.

Act, the Consumer Protection Act, and the State Antitrust Act. Shady Oaks, a Danvers park, was added to the litigation on similar charges; its owner also owned two of the Peabody parks.

A tenants' association of Mobile Estates park was permitted to intervene in the action; it filed its own pleading, asking a declaration that rent increases after 1981 were void and that the 1986 contract between the park, the tenant representatives, and the board was void. The intervener also alleged fraud, negligent misrepresentation, breach of contract, and violations of the State Civil Rights Act and of G. L. c. 93A.

f. *Determination of rents.* Upon cross motions for summary judgment in the Commonwealth's action, a judge of the Housing Court (to which the action had been transferred, see G. L. c. 185C, §§ 3, 20) in August, 1993, ruled by way of partial summary judgment that the "automatic" rent increases under the contracts were illegal, the 1987 Act was in force without need for express adoption by the city, and the board had not attended to the statutory factors. Accordingly, the judge ordered a remand to the board to determine the rents for 1991 and later years. (Pre-1991 rent increases, as provided in the contracts, could not be attacked, according to the judge, because of the running of the short, thirty-day periods under the Administrative Procedure Act, G. L. c. 30A, § 14[1], for seeking judicial review of administrative action.) The judge held, further, that the discontinuance notices were void for noncompliance with the permit procedures of the 1987 Act, St. 1976, c. 131, § 7A, inserted by St. 1987, c. 302, § 3. He also referred to violations of the Manufactured Housing Act, G. L. c. 140, § 32L(8) (text at note 9, *supra*), setting forth the procedures to be followed for discontinuances in localities that have permit procedures. The judge also seemed to say that the notices were in breach of § 32L(8) for failure to "disclose and describe" the nature of the discontinuance. The court retained jurisdiction to deal with claims under the Antitrust and Consumer Protection Acts, G. L. c. 93 and c. 93A.

A year later, on August 2, 1994, the judge ordered the board to commence the hearings on remand by September 23, 1994. This set the city in search of a suitable hearing officer, and the board finally selected Roger Mervis, formerly general counsel of the Cambridge rent control board, for the post. In July, 1995, Mervis informed the park owners about the general methodology that would be followed in calculating rents for the calendar

years 1991-1995. The statutory factors must be respected, he wrote, and the board had voted a formula which would consider those factors: it was the method of "pass-through" or "maintenance of FNOI." As will be seen, the calculation starts with the facts — rents charged, operating expenses, etc. — in a base year as close in time as appropriate to the advent of rent control in the city, here, 1976. Sundry adjustments lead to FNOI.

Mervis received evidence in public hearings about Little Trailer park (owned by Hilda Kapamagian) on August 22, 1995, and December 4, 1995. Here the facts for the year 1976 were available in good measure, as the park was in operation at the time. The public hearing for rent determinations for Red Hill (owned by Edwin Quinn, as trustee) was held on March 14, 1996. The first full year of operations at that park was not until 1979, which served as the base year, but Quinn said he did not have adequate records for that period because he assumed ownership (as trustee of Red Hill Trust) only in 1988. (His son, as trustee of another trust, owned the property in 1979.) Mervis therefore "imputed" certain 1979 expenses from current ones. Mervis made findings after considering the factors mandated by statute and applying the board-approved formula, and he issued reports and recommendations regarding the "legal maximum rents" the two parks could charge in the calendar years 1991-1995. The board held final hearings on February 21, 1996, and April 23, 1996, and adopted Mervis's recommendations as to both parks. The owners proceeded under G. L. c. 30A for judicial review of the administrative decisions, and the case fell to the same judge who was handling the balance of the Commonwealth's action beyond the grant of partial summary judgment. A "taxpayer's action" attacking Mervis's role also fell to this judge.[11]

g. *Chapter 30A reviews.* The judge allowed all the owners af-

[11]After the Commonwealth had amended its complaint to allege certain violations arising out of the discontinuance notices, the defendant park owners had objected to venue in the Suffolk Superior Court where the complaint had initially been filed. The Commonwealth's case was transferred to Essex Superior Court and then, on the removal motion of the Commonwealth pursuant to G. L. c. 185C, § 20, to the Northeast Division of the Housing Court Department, and, as noted above in the text, a Housing Court judge ruled on the cross motions for summary judgment. The taxpayer suit, although originally filed in Superior Court, was directed to be heard in the Housing Court by order of the Chief Justice for Administration and Management (CJAM). By another order of the CJAM, a Superior Court judge was assigned

fected by the remand to argue the "common issues" upon which, as they claimed, the legality of the redetermination of rents depended.[12] The judge also heard specific arguments on behalf of the Little Trailer and Red Hill parks. He concluded in a decision of August 30, 1996, that the decisions by the board to adopt Mervis's recommendations for Red Hill and Little Trailer were supported by substantial evidence and were not otherwise unlawful. He saw nothing in the "common issues" advanced by the other park owners that would render the general approach taken by Mervis and the board unlawful (leaving any specific claims of error in later rent redeterminations for parks other than Red Hill and Little Trailer to particular c. 30A reviews on behalf of those parks).

h. *Trial of balance of Commonwealth's suit.* In February, 1996, the Commonwealth amended its complaint against the board and the defendant park owners to comprise eight counts. Various park owners, tenants, and Peabody officials testified at a jury-waived trial on July 1-3, 1996. Here is a summary of the counts and the judge's rulings on them, drawn from his memorandum of August 30, 1996.

Counts I and II charged the board with breach of its duty to determine FNOI under the 1987 Act and the Peabody rent control ordinance. The judge in Housing Court had already ruled favorably to the Commonwealth in this sense upon the cross motions, resulting in the remand for the redetermination of rents. Correspondingly, the August, 1996, rulings held for the Commonwealth on counts I and II, and judgment entered thereon; the board has not appealed.

Counts III and IV were against the defendant park owners and dealt with the rental increases in 1991. Count III charged the owners with violating the Peabody rent control ordinance by dispatching notices of rent increases without the board's prior approval; the judge found that only one park (Mobile Estates) had sent such an anticipatory notice (on May 15, 1991) and this was allowable because the rents were then set by contract and the increase was approved by the board (which sent its own

to sit in the Housing Court to hear both the taxpayer action and the counts remaining in the suit by the Attorney General (with an intervener). This judge, sitting as a Superior Court judge, further heard the c. 30A reviews filed after the rent redeterminations.

[12]The "common issues" are summarized at II.1.a., *infra*, before they are discussed seriatim.

notices to Mobile Estates tenants on May 16, 1991). Count IV referred to G. L. c. 186, § 12, which requires thirty days' notice of rent increases to "tenants at will." The judge ruled that this statute did not apply to park tenants: they were not truly "tenants at will" because few reasons exist for which an owner may validly terminate a tenancy, see G. L. c. 140, § 32J, as amended through St. 1986, c. 557, § 126.[13] The Commonwealth has not appealed the rulings in favor of the park owners on these counts.

Counts V through VIII were against the owners who issued discontinuance notices to tenants. Count V alleged violations of the Manufactured Housing Act, G. L. c. 140, § 32J(4) (discontinuance notices to issue in "good faith"), and § 32L(8) (certain discontinuance procedures to be followed). Count VI charged violations of the Consumer Protection Act by reason of the violations charged in count V.[14] Count VII cited violation of the Antitrust Act, G. L. c. 93, § 4; it was dismissed prior to trial. Count VIII alleged the failure to follow the basic discontinuance procedures described in the 1987 Act.

On the basis of the evidence at trial (testimonial and documentary), the judge disagreed with the owners' argument that the discontinuance permit procedures outlined in the 1987 Act were not "self-enacting"; as the owners had disregarded these procedures they were in violation of the act and the Commonwealth succeeded under count VIII in wholly invalidating the discontinuances. The owners also may have violated the notice provision of the Manufactured Housing Act's § 32L(8). However, the judge thought this violation was at most technical, resulting from Peabody's failure to institute the discontinuance procedures contained in the 1987 Act. The judge declined specifically to find under count V that the defendant owners had acted with "bad faith" in issuing the discontinuance notices (see G. L. c. 140, § 32J[4]); rather, he specifically found that the owners had acted in good faith and· on advice of counsel (who believed, mistakenly, as it turned out, that the 1987 Act's

---

[13]After the events in this case, a provision was added to c. 140, § 32J, requiring compliance with the thirty-day notice provision of G. L. c. 186, § 12, when rent is increased. See G. L. c. 140, § 32J(5), inserted by St. 1993, c. 145, § 7.

[14]On the G. L. c. 93A claim, the Commonwealth sought an order that each of the nine defendant parks "pay civil penalties to the Commonwealth in the amount of $5,000 for each act or practice that the defendants knew or should have known was in violation of . . . c. 93A." The Commonwealth also sought costs and "reasonable attorneys' fees." See G. L. c. 93A, § 4.

discontinuance procedures were not in effect in August, 1991). And though the owners may have failed to "disclose and describe" in their notices the nature of the discontinuances, this failure would merely render the notices "void." Thus there was no basis in § 32L(7) for finding violations of the Consumer Protection Act under count VI.

There were various findings against the tenant interveners. They did not appeal.

i. *Taxpayer's suit.* The owners of Welch Mobile Home Park Villa filed a "taxpayer's suit" in August, 1995, claiming that the board's hiring of Mervis violated the Uniform Procurement Act, G. L. c. 30B; G. L. c. 44, §§ 2, 31; and certain Peabody spending ordinances. After a jury-waived trial held on June 3 and 4, 1996, the judge (in memorandum dated August 30, 1996) found against the owners. So also he ruled against the claim that Thomas O'Leary had functioned illegally as a member of the board after the expiration of his term in office. This lawsuit evidently struck the judge as an attack on redetermination of rents by another means.

j. *Upshot.* The nub of the rulings at the trial level can be stated thus. Those contracts intended to keep peace in Peabody were illegal. The Housing Court's remand to the board for redetermination of rents was appropriate, and the board was empowered to use the "pass through" method in fixing the rents. The attempts at discontinuance failed. Neither the Commonwealth nor the tenants could look forward to recoveries under c. 93A.

## II. *THE APPEALS*

The owner of Little Trailer (Hilda Kapamagian) has filed an appeal (No. 96-P-1587) from the c. 30A decision which found that the rents set for 1991-1995 were proper. So has Red Hill's owner (Edwin A. Quinn, trustee of Red Hill Trust) (No. 96-P-1563). The other park owners have filed a brief in the appeal of the Red Hill case on the "common issues" regarding the rent determinations. The Attorney General has appealed (No. 97-P-36) from the judge's rulings (on count V) that the park owners did not act in "bad faith" in issuing the discontinuance notices and committed, at most, a technical violation of the procedure under the Manufactured Housing Act, G. L. c. 140, § 32L(8). The Commonwealth also claims that the judge erred in declining to find that the park owners violated c. 93A. The park own-

ers have cross-appealed (in No. 97-P-36), arguing essentially that there were no violations on their part of the 1987 Act or any provisions of the Manufactured Housing Act. The Welch "taxpayers" have appealed from the dismissal of their suit about the Uniform Procurement Act and Peabody spending requirements (No. 96-P-1603).

1. *Nos. 96-P-1563 and 96-P-1587 — G. L. c. 30A appeals.*

We deal first with the common issues and then with any raised specifically by Little Trailer and Red Hill.

a. *Common issues.* These, though not sharply defined, may be stated thus: (i) the Housing Court's remand for redetermination of rents was beyond that court's authority; (ii) the board erred in using the FNOI standards of the 1987 Act in redetermining rates because that act was not in force; (iii) the 1987 Act is unconstitutional; (iv) use of the board's formula results in unconstitutional regulatory takings; (v) legislation effective in 1995 has abolished rent control of mobile home parks.

(i) *Housing Court authority.* The Attorney General's action, initially brought in the Superior Court, was transferred on his motion to the Housing Court pursuant to G. L. c. 185C, § 20, as appearing in St. 1992, c. 379, § 56 (allowing transfer by a party of "[a]ny civil action within the jurisdiction of the housing court department which is pending in another court department"). The Housing Court jurisdiction extends by G. L. c. 185C, § 3 (as appearing in St. 1987, c. 755, § 3), to "all housing problems, including all contract and tort actions which affect the health, safety and welfare of the occupants or owners thereof . . . and [the court] shall also have jurisdiction in equity . . . of all cases and matters so arising." A suit to correct a rent increase for mobile home occupants that was illegally authorized by public body seems to constitute a "housing problem" affecting the welfare of that characteristic population.[15]

The owners suggest that the Housing Court's remedy for the board's abuse of its statutory responsibility — a remand to the board for a proper performance of its duty — was beyond its power. We read the Housing Court's jurisdiction in equity as permitting exactly the remedy that was ordered. The owners also intimate that the Commonwealth's suit was "untimely" because the board had been setting rents according to the 1986

---

[15]There was no objection to the Housing Court's assumption of jurisdiction at the time.

Agreement for a number of years. As already noted, the judge held the suit could attack rents only from 1991 onward.[16] The Commonwealth's action for equitable relief for 1991 and subsequent years did not resemble an application for c. 30A review with a thirty-day requirement; if resemblance could conceivably be found, the time limit might be thought met by the fact that the action was filed on June 28, 1991, the rental increase under the 1986 Agreement having taken effect on June 1, 1991.

(ii) *Self-enactment of the 1987 Act.* We think the 1987 Act, with its fresh standards, was alive in Peabody although the city had not accepted it by enacting a corresponding ordinance. Where, as in the present case, a city petitions for legislation and does not request authority to adopt it, and the Legislature itself does not require local adoption, the legislation is in force without more. (The 1976 Enabling Law states in § 9: "This act shall take effect upon its acceptance by the city of Peabody"; the 1987 Act has no such provision.) In *Civitarese* v. *Middleborough*, 412 Mass. 695, 696, 700-702 (1992), the Legislature, on Middleborough's petition, enacted legislation to enable the town to "control rents and evictions at mobile home parks"; neither the petition nor the statute referred to local acceptance. A mobile park owner contended that the legislation remained ineffective unless accepted by the town, but the court held otherwise: the statute was self-enacting. The Home Rule Amendment (art. 89 of the Amendments to the Massachusetts Constitution) has nothing to the contrary.

(iii) *Constitutionality of the 1987 Act.* The court in *Marshal House, Inc.* v. *Rent Review & Grievance Bd. of Brookline*, 357 Mass. 709, 714 (1970) (*Marshal House I*), stated: "It is within the power of the Legislature, where there is reasonable basis in fact for such a determination, to conclude that an emergency exists in certain areas with respect to residential housing and to take action 'in the exercise of its police power,' including provisions for rent control, to relieve the emergency." See *Marshal House* v. *Rent Control Bd. of Brookline*, 358 Mass. 686, 700 (1971) (*Marshal House II*) (rent control legislation found to be justified by a "supportable legislative finding of a housing emergency"). The owners say the 1987 Act fails because it is

[16]As no one complains of this ruling, we need not speculate about any possible procedural routes with more generous time allowances for attempting revision of the earlier rental increase.

not "supported" by such findings. The 1976 Enabling Law did contain a declaration of a "serious public emergency" in Peabody "with respect to the housing of a substantial number of citizens of said city, which emergency has been created by excessive, abnormally high and unwarranted rental increases imposed by some owners of mobile home parks located therein . . . ." St. 1976, c. 131, § 1. The 1987 Act amended § 1 by "adding" a "paragraph" which discusses the emergency created by "the threatened discontinuance" of mobile home parks in Peabody. See St. 1987, c. 302, § 1. The 1987 Act essentially revises the FNOI standards for correcting excessive rents and the earlier declaration of emergency on that subject carries over: a repetitious separate declaration should not be required. Cf. *Opinion of the Justices*, 427 Mass. 1211, 1215 (1998) (as to legislative power of amendment). Of course there is a clear enough declaration of emergency in the discontinuance provision of the 1987 statute. See St. 1976, c. 131, § 7A(*e*)(5), inserted by St. 1987, c. 302, § 3. The owners advance no argument that in fact emergency conditions have ended, which perhaps in itself is an end to the question of declarations. See *Newell* v. *Rent Bd. of Peabody*, 378 Mass. 443, 448-449 (1979) ("[T]he regulation of rents may not continue beyond the emergency. The continuing existence of an emergency is a question that may be presented for further consideration, not only to the Legislature and the city, but also to the courts").

The owners urge in a separate argument that the 1987 Act impairs the 1986 Agreement and thus offends the contracts clause of the United States Constitution, art. I, § 10, cl. 1. Conventionally, one claiming a violation of the contracts clause must show State action that substantially impairs an enforceable obligation of contract, with impairment failing justification as reasonable and necessary to serve an important public purpose. See *United States Trust Co.* v. *New Jersey*, 431 U.S. 1, 17, 25 (1977). See also *Massachusetts Community College Council* v. *Commonwealth*, 420 Mass. 126, 131-133 (1995).

As it happens, the contract formed by the owner of Red Hill, the tenants, and the board dates from 1988, after the passage of the accused 1987 Act. As for the contracts executed prior to the 1987 Act, they did not create enforceable obligations. We may observe they were not signed by the tenants individually but by tenant "representatives," so initial questions arise about enforceability against nonsigners. More important, the mandatory

percentage increases were illegal by reference even to the 1976 Enabling Law because the board paid no attention to the FNOI as legislated. Even assuming otherwise valid contractual obligations, the impairment by statute would be condoned in a constitutional sense, for it serves the public purpose of providing a "viable, affordable housing option to many elderly persons and families of low and moderate income, who are often lacking in resources and deserving of legal protection." *Greenfield Country Estates Tenants Assn., Inc.* v. *Deep*, 423 Mass. 81, 83 (1996). Operating in so long and highly regulated a market, the owners indeed were "on notice that future legislation may adjust [their] position[s]." *Nationwide Mut. Ins. Co.* v. *Commissioner of Ins.*, 397 Mass. 416, 424 (1986).

(iv) *Regulatory taking*. The owners' contention is that the Fifth Amendment to the United States Constitution or art. 10 of the Massachusetts Declaration of Rights serves to invalidate the FNOI standard of the 1987 Act (eventuating in the board's formula for determining rents by a "pass through" method).[17] For the park owners who have not yet had their 1991 and later years' rents determined, this "common issue" may be seen as a facial attack on the constitutionality of the rent control scheme. See *Greenfield Country Estates Tenants Assn., Inc.* v. *Deep*, 423 Mass. at 85. The owners can make no claim that the way Peabody regulates rents amounts to a physical invasion or confiscation of their property. See *Steinbergh* v. *Cambridge*, 413 Mass. 736, 741 (1992), cert. denied, 508 U.S. 909 (1993). Nor does it "deny all economically beneficial or productive use of the [owner's] interest in the property." *Ibid.*, citing *Lucas* v. *South Carolina Coastal Council*, 505 U.S. 1003, 1015-1019 (1992), and *Agins* v. *Tiburon*, 447 U.S. 255, 260 (1980).

So far from suffering an illegal taking, the owners here are secured by statute in the right to a determination of rents that will yield the FNOI (in this they resemble the plaintiffs in *Stein-*

---

[17]"In considering whether economic regulations satisfy due process, we have established no substantially different guiding standards under the Commonwealth's Constitution than the Supreme Court has established under the Constitution of the United States. . . . Although a similarity in standards under the 'takings' clauses of the two Constitutions has not been as clearly established, the [owners] have advanced no reason why we should create takings principles more favorable to them than those developed under the Federal Constitution." *Steinbergh* v. *Cambridge*, 413 Mass. 736, 738 (1992), cert. denied, 508 U.S. 909 (1993).

*bergh* who unsuccessfully challenged rent control legislation on "takings" grounds). The statutory standard for facts to be considered by the board appears reasonable on its face and is far from any confiscatory intention or threat. Indeed, the Supreme Judicial Court has upheld the constitutionality of a statute (St. 1970, c. 842, § 7) containing "factors" for regulating rents virtually identical to those in the 1987 Act. See *Marshal House II*, 358 Mass. at 702-706.[18]

The board in the present case reduced the standard to practice, so to speak, by adopting the "maintenance of FNOI" or "pass-through" method or formula, which was well within the board's discretion, see *Altschuler* v. *Boston Rent Bd.*, 12 Mass. App. Ct. 452, 461 (1981), and, like the standard itself, is entitled to a presumption of validity, see *Zussman* v. *Rent Control Bd. of Brookline*, 371 Mass. 632, 639 (1976). Cf. *Bankers Life & Cas. Co.* v. *Commissioner of Ins.*, 427 Mass. 136, 143 (1998) (judicial deference to agency's expertness "applies particularly to [its] 'choice of methodology' in rate cases").

The pass-through formula first looked to rents and expenses to configure a FNOI for the "base year" of 1976, preceding the pertinent rent control in Peabody. This use of a rollback has "the advantage of setting rents at levels which landlords and tenants had worked out for themselves by free bargaining in a competitive market . . . ." *Marshal House II*, 358 Mass. at 701 (internal quotations and citation omitted). See *Chelmsford Trailer Park, Inc.* v. *Chelmsford*, 393 Mass. 186, 197-198 (1984) ("dispos[ing] . . . summarily" of an argument that the rollback provision of rent control legislation constituted an "ex post facto law"). After rollback, the FNOI is updated by an "inflation factor" for the later year; added to the FNOI is the sum of current operating expenses[19] and capital improvements (as amortized over the useful lives of the improvements). So maximum lawful rents are arrived at. The owners' argument that the board should not have looked to so early a base year fails because it does not sufficiently recognize the effect of the

---

[18]The court noted, at 705, that these factors were "not original with this act [St. 1970 c. 842, § 7]. They are substantially identical to those contained in § 5(a) of St. 1953, c. 434, earlier rent control legislation passed in this Commonwealth."

[19]Certain categories of expenses were excluded — mortgage principal and interest and unnecessary, avoidable, or unduly expensive cost items.

updating by an inflation factor; again, the board's decision as to a base year appears well within its discretion.[20]

We add that the pass-through method is not new to the annals of rent control. See *Niles* v. *Boston Rent Control Administrator*, 6 Mass. App. Ct. 135, 138 (1978) (noting that Boston's rent control administrator, pursuant to regulation, utilized a "cost pass-through method" for determining rents).[21] See also Note, Reassessing Rent Control: Its Economic Impact in a Gentrifying Housing Market, 101 Harv. L. Rev. 1835, 1842 n.41 (1988) (suggesting that "fair net operating income . . . be set equal to a 'base year' net income . . . that acts as a ceiling on the economic rent"); Baar, Guidelines for Drafting Rent Control Laws: Lessons of a Decade, 35 Rutgers L. Rev. 723, 785, 809-811 (1983) (estimating that the "maintenance of net operating income standard" was utilized in sixty percent of rent controlled units in the United States and commenting that this standard pursues "the best available option, which is to preserve prior net operating levels").

The owners go on to protest that a combination of rent control and regulation of discontinuances forces them to remain in business and at the same time deprives them of a return on the value of their land they might otherwise expect. The combination appears necessary in the public interest to prevent the predicated "emergency" in which needful tenants would lose their homes. Cf. *Greenfield Country Estates Tenants Assn., Inc.* v. *Deep*, 423 Mass. at 86 (mobile home tenants' "right of first refusal," accorded by Manufactured Housing Act, G. L. c. 140, § 32R, advances public goal by allowing the tenants "to purchase the land on which their homes exist and thus avoid discontinuances of manufactured housing communities"). That regulation of discontinuances for public purposes may contribute to some loss of economic benefits by the park owners does not invalidate the regulation. See *Fragopoulos* v. *Rent Control Bd. of Cambridge*, 408 Mass. 302, 308 (1990). It must, however, be admitted that there is as yet little experience with discontinuances in Peabody because, as explained, the procedure has been on hold.

---

[20]At heart, the owners' argument was that the board should have looked to the contractually set rents, a recourse surely excluded if only because those rents were illegal.

[21]The *Niles* case further stated that "fair net operating income" need not take into consideration the "fair market value" of the property regulated. *Id.* at 142-144.

(v) *Abolition of rent control.* Does G. L. c. 40P, the Massachusetts Rent Control Prohibition Act, forbid Peabody to control rents for the mobile home lots?

"[T]he voters of the Commonwealth, on November 8, 1994, approved the [statute] which terminated rent control effective January 1, 1995. This law contained no savings clause. See G. L. c. 40O (1994 ed.) (second c. 40O). Thereafter, the Legislature enacted St. 1994, c. 282, effective January 1, 1995, a limited transitional statute designed to alleviate hardship that might·be suffered by certain tenants in rent controlled units. This statute did not revive rent control, but provided for certain rights and procedures in order to bring about the orderly termination of rent control. . . . Section 9 of St. 1994, c. 282, calls for the termination of the transitional law on December 31, 1996." *Zuker* v. *Clerk-Magistrate of the Brookline Div. of the Dist. Ct. Dept. of the Trial Court,* 423 Mass. 856, 859 (1996). Subsequently, by St. 1997, c. 19, § 10, the Legislature redesignated §§ 1-5 of G. L. c. 40O, inserted by St. 1994, c. 368, § 1, as G. L. c. 40P.

Section 3 of c. 40P defines "rent control" as

"(a) any regulation that in any way requires below-market rents for residential properties; and·

"(b) any regulation that is part of a regulatory scheme of rent control as defined in clause (a), including the regulation of occupancy, services, evictions, condominium conversion and the removal of properties from such rent control schemes; *except that*

·"(c) *this definition does not include* the regulation of, or agreements affecting, publicly owned housing, publicly subsidized housing, federally assisted housing, or *mobile homes*" (emphases added).

There is argument that while "mobile homes" are excepted from the prohibition of rent control, mobile home "parks" or mobile home "lots" are not. Thus, say the owners, the legislation allows control of the rental of the mobile homes themselves, but not of the "lots" or "pads" on which the mobile homes sit. It is true that past legislation has recognized the distinction between "mobile homes" (as personalty) and "mobile home

lots" or "mobile home parks" (as realty).[22] Section 2 of c. 40P states that the purpose of the enactment is to "broadly prohibit[] any regulatory scheme based upon or implementing rent control," and the owners' proposed interpretation of § 3 would narrow the scope of the exception permitting the continuance of rent control. But that would prove too much: the owners' reading would make a virtual nullity of the exception. For the owners do not deny that in by far the larger number of situations the "tenant" (so-called) of the mobile home owns the structure itself and rents the "lot" or "land" from the park owner.[23] The regulations in Peabody, as in other communities, speak to the rents a park owner may charge, not to rents a mobile home owner (not occupying the home) may charge to one permitted to occupy the home. Finally, the reference of § 3 to mobile homes appears in context with public and federally assisted housing. These are fields that have been highly regulated to provide affordable housing for exigent classes of citizens, and there is reason to believe that the Legislature would be loath to withdraw any of them from rent control.

(b) *Little Trailer's arguments.* This park joins in argument on common issues considered above, but does not assert error in Mervis's findings and recommendations adopted by the board or in the application of the formula for rent determination. Rather curiously, Little Trailer tries to argue that the whole process of rent determination has been tarnished by Thomas O'Leary's acting on the board after his term expired on December 31, 1994. If he could not hold over, there might possibly be difficulty with the requirement of Peabody's rent control ordinance that there shall be a member on the board who was a "tenant representative." But the judge wrote correctly: " 'It is the general rule that, unless otherwise provided, an officer continues to hold office until the appointment or election and

[22]See, as illustrative, G. L. c. 140, § 32F, as appearing in St. 1964, c. 592, § 9 (defining a "mobile home park" as "[a]ny lot or tract of land upon which three or more mobile homes occupied for dwelling purposes are located"); G. L. c. 171, § 61, as appearing in St. 1990, c. 79, § 1 (allowing a credit union to "make a loan for the purpose of financing the purchase of a movable dwelling, hereinafter called a mobile home"); G. L. c. 186, § 14, as appearing in St. 1973, c. 778, § 2 (requiring that any lessor of property, "including a mobile home or land therefor," supply water, heat, etc., if required by law or by the terms of the tenancy).

[23]In fact, "tenant rosters" from the several parks reproduced in the record appendix reveal that almost all the mobile homes are owner-occupied.

qualification of his successor.' 7 Opinion of the Attorney General 415, 471 (May 9, 1924). See also G. L. c. 41, § 2 (regarding the election of new town officers, 'the office of such existing . . . officer shall terminate upon the qualification of a new . . . officer')."

(c) *Red Hill's arguments.* After public hearing with representation by the park, tenants, and the Attorney General's office, Mervis made specific findings. The park opened for business in 1978; it was then owned by the Willowdale Trust, of which Paul Quinn was trustee. For all of 1979, the park was in operation and fully rented. The Red Hill trust, with Edwin A. Quinn as trustee, acquired the park from Willowdale in January, 1990. Mervis denied Red Hill's request that he use 1990 as the base year and instead used 1979.

The park's gross income in 1979 was $23,580.00, with total operating expenses at $16,699.93 (because of absence of contemporary documentation, some expense items were "imputed" from expense items for 1991). The year's FNOI thus was $6,880.07. Mervis used documentation submitted by Red Hill to calculate the operating expenses for each year in the period 1991-1995. In one case, 1991, he "cut" the claimed garbage expense of $8,400 as unreasonable and excessive in light of the expense of approximately $2,500 incurred in years before and after 1991. For 1995 he treated "removal of an oil tank and contaminated soil" as "capital improvements" in accordance with a board regulation. Failing any produced amortization schedule, Mervis spread the cost over a ten-year period.

The 1979 FNOI was adjusted for each year, 1991-1995, by the respective consumer price indexes, and with yearly total operating expenses added, maximum legal rents per year were attained for the park, which by division yielded monthly rent per lot (in 1991, $133.78).

To the extent Red Hill takes issue with the use of 1979 as base year (for which certain actual records could not be furnished), the partial disallowance of the garbage expense for 1990, and the amortization figure for 1995, the board's decisions grounded on the hearing officer's findings appear (as the judge held) based on substantial evidence and within the board's discretion, not arbitrary or capricious or otherwise contrary to law (to recur to the text of G. L. c. 30A, § 14[7]). See *Kahn* v. *Brookline Rent Control Bd.*, 394 Mass. 709, 712 (1985) (review-

ing court to give "due weight" to a rent control board's expertness).

Red Hill has argued that the formula applied in determining rents did not result in the realization of FNOI for the park because it failed to realize the owner's "investment backed" expectations: the formula did not take into account the owner's mortgage payments. "[T]he evidence before the Board indicates," said the judge, "that Red Hill was financed at or near 100%, with little or no capital outlay by the Trust. . . . [T]he financial arrangements of the owner should not be reflected by higher rents paid by the tenant." See *Niles* v. *Boston Rent Control Administrator*, 6 Mass. App. Ct. at 146 (rates are confiscatory if they make it impossible for an "efficient operator" to remain in business or derive any profit). See also Baar, 35 Rutgers L. Rev. at 810 (pass-through method is advantageous because "it avoids the circularity associated with return-on-value standards, and it does not base fair returns on the particular purchase price, investment, or financing arrangements of the owner"). It may be noted, further, that the instant owner acquired the property well after the advent of rent control in Peabody and, indeed, after the 1987 Act and so was on notice of the applicable FNOI standard. Any suggestion that the owner was misled into acquiring the Red Hill property by the presence of the 1986 Agreement omits consideration of the illegality of that arrangement.

2. *No. 97-P-36.*

Reverting to the Attorney General's action for the Commonwealth, the Commonwealth appeals on the counts adjudged against it after trial; the owners cross-appeal on those decided against them.

a. *The cross appeal.* This is a flank attack by the owners on statutes they have been or may be charged with violating and on the right of the Attorney General to enforce them. (With the failure of their arguments on the cross appeal, questions about the alleged violations, or as to their materiality, are discussed later on.)

(i) *Constitutionality of Manufactured Housing Act provisions.* The owners attack c. 140, § 32L(8), dealing with discontinuance notice procedure because it amounts to "rent control" and required legislative findings of emergency. Whether the section can be properly characterized as rent control may well be doubted — rather it regulates a detail of the mobile home park

relationship — but, whatever the characterization, we think the section stands as a valid regulation in response to the realities of the market without the need for the trumpeting of an emergency. Compare *Greenfield Country Estates Tenants Assn., Inc.* v. *Deep*, 423 Mass. at 85, where a park owner attacked c. 140, § 32R, as unconstitutional. That statute "required an owner of a manufactured housing community who intended to sell the property on which the community was located to give notice to the tenants of the community and to provide the tenants with information regarding a bona fide offer of purchase received from a third party." *Id.* at 83. The section also gave the tenants the "right of first refusal to purchase the property." *Id.* at 83-84. The court found that "the statute substantially advances a legitimate State interest," namely, "to avoid discontinuances of manufactured housing communities and to ensure that tenants of such communities are not left at the peril of their landlords due to a practical inability to relocate a manufactured housing unit." *Id.* at 86. Section 32L(8) advances a like interest. On a similar view, c. 140, § 32J(4), dealing with good faith in discontinuance, survives constitutional attack.

We may pass over the owners' attempted resort to "equal protection," on the alleged ground that there is no rational basis for the State to treat them differently from other landlords. The realities of mobile home parks provide a refutation. See *Newell* v. *Rent Bd. of Peabody*, 378 Mass. at 449 (rejecting Peabody park owners' claims that the 1976 Enabling Law violated their rights to equal protection).

(ii) *Standing of the Attorney General*. The owners do not question the authority of the Attorney General to bring suit against them under the Manufactured Housing Act (see the express provisions of G. L. c. 140, §§ 32L[5] and 32P). Nor do they doubt his standing to sue under the Consumer Protection Act, see G. L. c. 93A, § 4. Rather they dispute his standing to proceed for the board's alleged violations of the 1976 Enabling Law and the 1987 Act in approving the automatic contractual rent increases. The owners also cavil with the Attorney General's right of suit for their failure to follow the discontinuance procedures of the 1987 Act.

The owners were not charged in the relevant counts I and II. These counts alleged violations by the board, and the board has not appealed from the adverse rulings. At all events, the Attorney General has statutory authority to bring "all suits and

other civil proceedings in which the commonwealth is party or interested," G. L. c. 12, § 3, as appearing in St. 1943, c. 83, and "shall take cognizance of all violations of law . . . affecting the general welfare of the people . . . and shall institute or cause to be instituted such criminal or civil proceedings . . . as he may deem to be for the public interest . . . ," G. L. c. 12, § 10, as appearing in St. 1960, c. 788. We are not detained by the owners' idea that the matters litigated were of local, not "public interest."

The cross appeal is without merit and the decision on counts I through IV will stand.

b. *Commonwealth's arguments.* The Attorney General argues that the judge erred in declining to find violation of c. 140, § 32J(4), requiring "good faith" in discontinuance notices; in finding no more than a technical violation of the discontinuance procedure of the Manufactured Housing Act, c. 40, § 32L(8); and in failing to grant the Commonwealth relief under c. 93A.

(i) *Good faith discontinuances.* Chapter 140, § 32J, in text as of August, 1991, specified the reasons for which a tenancy could validly be terminated: one was "discontinuance in good faith by the licensee, of the use of part or all of the land owned by the licensee as a mobile home park." G. L. c. 140, § 32J(4), as appearing in St. 1975, c. 692. We cannot say there is a clearcut answer on the record to the question of good faith. The judge appraised the situation thus: "[Owners' counsel] were of the view, and so advised their clients, that the 1986 Agreement was valid for a variety of reasons. Further, counsel reported to their clients that the [c]ity of Peabody would soon be enacting a discontinuance permit process which would make more difficult any attempts to discontinue park operations in the future." As a result of the preliminary injunction freezing rents at 1990 levels, the park owners "considered themselves confronted with a Hobson's choice: do nothing and run the risk of increasing regulation both of rents and of any future attempts at discontinuance, or send out notices of discontinuance in the hope of keeping a greater number of options open. The park owners (with the exception of Red Hill . . .) uniformly chose the latter. Perceiving the quid pro quo (six percent rent increases for agreement to keep the park open) to have been voided by the tenants, . . . the park owners sent out notices of discontinuance." The judge concluded that the notices were issued "in good faith and upon advice of counsel in order to safeguard the

rights of the owners to discontinue in light of their belief, however misguided, that the passage of the impending legislation by the [c]ity would increasingly regulate the circumstances under which they could go out of business. . . . Upon the facts found, the Commonwealth has not proved that the notices of discontinuance were issued as a pretext to retaliate against residents . . . ."

The Commonwealth suggests that good faith should be equated with an actual, subjective intention to discontinue operation of the mobile home parks. It would be hard to define and harder to apply such a criterion. On the law as the owners then understood it, they could discontinue as a matter of course upon providing tenants with the two years' notice, § 32L(8), and meeting the prescribed "survey" and "relocation benefits," § 32L(7A).

Further, the Commonwealth suggests that an "attempt to evade" the local discontinuance process should not qualify as a good faith discontinuance. But this is to disregard the history of the matter and the judge's specific finding — "the park owners did not seek to apply for or to obtain discontinuance permits prior to August of 1991 because of a good faith belief made upon advice of counsel that there was no requirement that they do so." The judge found support for his good faith finding in the fact that three park owners applied for discontinuance permits once the city amended its rent control ordinance (in September, 1991) to incorporate the discontinuance provisions of the 1987 Act. But, even then, the city was "hopelessly confused as to the application of [the 1987 Act] to the 1986 Agreement which had defined the peace for the mobile home parks in its borders and would await judicial resolution of the dispute."

It was surely not clear error for the judge to find as he did on the question of good faith;[24] on the contrary, his treatment of the

---

[24]The Commonwealth has complained that certain evidentiary rulings in the course of the trial were incorrect and could have prejudiced its showing on good faith. We see no sound basis for the complaint.

The Commonwealth also complains that the judge declined to apply "retroactively" c. 140, § 32L(8), as appearing in St. 1993, c. 145, § 16, which would cast the burden on park owners issuing discontinuance notices to show that they did so in good faith. Without deciding whether the amendment should be held to reach back to the 1991 notices, we note that the judge indicated affirmatively his view that the owners had acted in good faith.

subject is meticulous, thorough, and persuasive.[25]

(ii) *Following discontinuance procedure.* Section 32L(8) of
c. 140 (in outline), required a park owner to give fifteen days'
notice to tenants that he would be appearing before a govern-
ment board to request a permit for discontinuance of the park; if
the discontinuance did not need a permit, the owner was to give
tenants two years' notice that discontinuance would occur; the
owner was to disclose and describe in the notice the nature of
the discontinuance.

The park owners did not give notice that they would appear
before a board to seek a permit, and the Commonwealth claims
this as a violation of the statute. It may be enough to say the
owners could not truthfully say they would so appear: their
position was that they had no such duty. The Commonwealth
reads the provision as reintroducing the prescribed procedures
of the 1987 Act for securing a permit; on that basis it faults the
owners for not providing the formal fifteen-day notices. The
judge saw this line of argument as unrealistic. In August, 1991,
when the owners sent their discontinuance notices, the 1987 Act
did indeed set out permit procedures, but the city had not fol-
lowed suit and, as the judge wrote, "the [c]ity, the [b]oard, and
the park owners were under the mistaken impression that [the
procedures] were not self-enacting and that the 1986 Agreement
determined by contract the amount of time the parties would
remain open . . . . It would be nonsensical for the owners to
notify the residents that they would be appearing before the
[c]ity to request a permit when the city had no permit procedure
and one was not deemed to be necessary."

Where their appearance before a board to secure discontinu-
ance permits was not required (as the owners conceived to be
the case), their two-year notices to tenants must still "disclose
and describe" the nature of the discontinuance. So § 32L(8)
seems to say, and such a requirement is not inconsequential, for
it may help tenants to plan ahead: for example, if a discontinu-
ance is premised on a proposed sale of a park, the tenants may
attempt collectively to exercise a right of first refusal, see G. L.
c. 140, § 32R. The judge states that some of the two-year
notices sent to tenants in August, 1991, indicated that the own-
ers had not yet decided what use would be made of the land

---

[25]In light of the finding on good faith, we may pass over the doubt expressed
by the judge whether, as a textual matter, c. 140, § 32J(4), could apply where
no tenancies had actually been terminated.

(indicating, however, that the land might lie fallow). The remaining notices were more "succinct" and did not advise the tenants what the owners intended to do with the land following the discontinuances. Even if a description was inadequate within the meaning of § 32L(8), this, the judge thought, might have only the result of voiding the notice, so that the two-year period would not in any event start to run; it should not count as a violation — or more than a technical violation — of the statute itself. (It is not clear how far the judge's view here differed from that of the judge who earlier ruled on the cross motions.) The judge was manifestly influenced in appraising motives and conduct by the turmoil that existed at the time. Of course, the notices were void and the discontinuances invalid in the ulterior and basic sense that the 1987 Act is held self-enacting.

(iii) *Consumer protection.* According to c. 140, § 32L(7), as it read at the time of the issuance of the discontinuance notices,

> "[f]ailure to comply with any of the provisions of this section shall constitute an unfair and deceptive trade practice under the provisions of paragraph (a) of section two of chapter ninety-three A. Enforcement of compliance and actions for damages shall be in accordance with the applicable provisions of section four to ten, inclusive, of said chapter ninety-three A."

G. L. c. 140, § 32L(7), as appearing in St. 1986, c. 317, § 2. With the holding that the owners were not in breach of c. 140, § 32J(4), or in not more than a technical breach of § 32L(8), any claim through the medium of c. 140, § 32L(7), that the owners are liable in those respects under c. 93A also falls. Breach of the 1987 Act would not itself give rise automatically to a c. 93A violation, see *Churgin* v. *Hobbie*, 39 Mass. App. Ct. 302, 308 (1995), and cases cited, and in all the circumstances considered at length by the judge, he was justified in ruling that the owners' conduct was not unfair or deceptive in the meaning of c. 93A. Thus the Commonwealth does not succeed on count VI.[26]

3. *No. 96-P-1603 — taxpayer's suit.*

The Welches, owners of Welch Mobile Park, sued as Peabody

---

[26]We need not consider an argument that there was a violation of c. 140, § 32N (on "retaliation"), as that was not raised as a claim in the complaint. At all events, the judge found no retaliation by the owners.

taxpayers and now appeal from the adverse judgment in their case. The question is whether the hiring of Mervis as hearing officer was in violation of the Uniform Procurement Act, G. L. c. 30B, which outlines the procedures by which municipalities may contract for services. More particularly, the Welches claim the contract with Mervis ignored applicable competitive sealed bid requirements, § 5, and quotation procedures, § 4.

Citing § 1(*b*)(15), the judge said the sections just referred to did not apply to "contracts with labor relations representatives, lawyers, designers or certified public accountants"; Mervis was a lawyer (with much experience in the administration of rent controls). And Mervis was hired in his role as a lawyer: the officials, commanded by the Housing Court rulings to redetermine rents for the mobile home parks, were naturally anxious for guidance in complying with the legal implications of those rulings; moreover, the issues were not only complicated but contentious. Mervis performed distinctive legal work in preparing his findings and recommendations and advising the board about its responsibilities. We agree that § 1(*b*)(15) controls. (We add that it would be an oddity to nullify the actions taken by the board even if Mervis's hiring was vulnerable.)

We also support the judge's conclusion that the city did not "exceed appropriations" in payments to Mervis for services. The funds were "properly procured" according to city ordinances although the billings exceeded the original estimates.[27]

*Conclusion.* In Quinn *vs.* Rent Control Board of Peabody, and in Kapamagian *vs.* Rent Control Board of Peabody, the judgments sustaining the decisions of the Board are affirmed. In Commonwealth *vs.* Rent Control Board of Peabody, the judgment as noted on the several counts of the complaint is affirmed, and the judgment for the defendants on the interveners' complaint is affirmed. In Welch *vs.* City of Peabody, the judgment for the defendants and the declarations a and b (the first so lettered) are affirmed.

*So ordered.*

---

[27]The taxpayers also challenged O'Leary's holdover, discussed above in Little Trailer's c. 30A appeal.