RICHARD W. GANNETT vs. JODY C. SHULMAN.[1]

No. 06-P-1920.

Norfolk. January 18, 2008. - July 6, 2009.

Present: PERRETTA, LENK, & SIKORA, JJ.

*Practice, Civil,* Summary judgment. *Unlawful Interference. Deceit. Attorney at Law,* Lien. *Judgment,* Amendment.

In an action brought by one attorney (plaintiff), claiming deceit and intentional
    interference with an advantageous relationship arising from another at-
    torney's (defendant's) disbursement of divorce settlement funds received
    by a client, without regard for any interest that the plaintiff claimed to
    have had in those funds (for payment of legal services the plaintiff rendered
    to the same client in a bankruptcy proceeding), the judge did not err in
    granting summary judgment in favor of the defendant, where the plaintiff
    failed to demonstrate either that he had an economic interest (i.e., a right
    to an attorney's lien) in the proceeds in the divorce action, or that the
    defendant's failure to inform the plaintiff of the client's dismissal of her
    bankruptcy claim interfered with his right to an attorney's lien [611-615];
    similarly, no error arose from a trial court judge's denial of the plaintiff's
    motion to alter or amend the judgment, based largely on the same ground
    [615].

CIVIL ACTION commenced in the Superior Court Department on October 3, 2001.

The case was heard by *Patrick F. Brady,* J., on a motion for summary judgment, and a motion to alter or amend the judgment was considered by him.

*Michael J. Manfreda* for the plaintiff.

[1]The appellee, Jody C. Shulman, did not file a brief and, therefore, did not participate in oral argument. See Mass.R.A.P. 19(c), 365 Mass. 868 (1974). Because Shulman took no part in Gannett's appeal, we can only assume that the materials provided us by Gannett in the record appendix fulfilled the obligations imposed upon him by Mass.R.A.P. 18(a) and (b), as amended, 425 Mass. 1602 (1997). See *Chokel* v. *Genzyme Corp.*, 449 Mass. 272, 279 (2007); *Shawmut Community Bank, N.A.* v. *Zagami*, 30 Mass. App. Ct. 371, 372-374 (1991), *S.C.*, 411 Mass. 807 (1992).

PERRETTA, J. This action, brought by Attorney Richard W. Gannett against Attorney Jody C. Shulman, arises out of a dispute concerning Shulman's disbursement of funds to a client each attorney represented in different proceedings. Shulman represented Jane Compagnone Erickson (the client) in a divorce action brought by her husband, Ronald P. Compagnone (the husband), and Gannett represented her in bankruptcy proceedings which the husband had initiated. Gannett argues that Shulman's disbursement of settlement funds received by the client from the husband in the divorce action, without regard for any interest he, Gannett, claims to have had in those funds (for payment of his legal services rendered to the client in the husband's bankruptcy proceeding) was an intentional interference with his advantageous relationship with the client and deceitful. Concluding that Shulman's act of disbursing the funds to the client was appropriate, we affirm the judge's grant of summary judgment to Shulman and the denial of Gannett's motion to alter or amend the judgment. See Mass.R.Civ.P. 56(b) & 59(e), 365 Mass. 824, 828 (1974).

1. *The undisputed facts.* We relate the circumstances of the controversy between Gannett and Shulman based upon Gannett's complaint and the *undisputed* facts as they appeared in the materials before the judge ruling on Shulman's motion for summary judgment and as included in the record before us, i.e., Shulman's admissions to Gannett's requests made pursuant to Mass. R.Civ.P. 36, 365 Mass. 795 (1975), the client's affidavit, and the relevant exhibits.[2] We do not consider the transcript of Shulman's deposition as there is nothing before us to show that it was acknowledged by Shulman to be a true and accurate record of her testimony or certified by the shorthand reporter.

On or about May 14, 1999, the client entered into a fee agreement with Gannett regarding the husband's divorce complaint as well as his voluntary petition for bankruptcy filed pursuant to Chapter 7 of the Bankruptcy Code. Common to both the husband's action for divorce and his voluntary petition for bankruptcy were the client's allegations that the husband had fraudulently conveyed certain marital assets to third parties, including

---

[2]Gannett did not include Shulman's answer to the complaint in the record appendix.

his father, and had misappropriated and squandered the proceeds of a home equity line of credit.

Notwithstanding her fee agreement with Gannett and without protest from him, the client thereafter retained Shulman to represent her in the divorce action while instructing Gannett to continue to represent her in the bankruptcy proceedings. In the course of their respective actions on behalf of their mutual client, Gannett discussed the bankruptcy proceedings with Shulman, and Shulman discussed the divorce action with him.

On September 21, 1999, the United States Bankruptcy Court allowed the husband's motion for summary judgment on all the client's claims but one, her claim based upon the alleged misappropriation of the proceeds of a second mortgage. While the client's remaining claim was pending in the bankruptcy court, Shulman was proceeding on behalf of the client in the divorce action. In the course of her representation of the client in that proceeding, Shulman prepared a separation agreement which was to retain its independent legal significance. Exhibit D to the agreement, captioned "CHAPTER 208, SECTION 34 DISTRIBUTION," reads in full:

> "1. In consideration of the sum of $17,500 being paid to [the Wife], the Wife hereby releases the Husband from any and all claims under Chapter 208, Section 34, including any claim for alleged fraudulent transfer of property. . . . Said sum to be paid forthwith."

There were two additional and relevant provisions. Section III of the agreement, entitled "MUTUAL RELEASE," provides:

> "[T]he Husband and Wife each hereby releases and forever discharges the other from any and all actions, suits, debts, claims, demands, and obligations whatsoever, both in law and in equity which either of them has ever had, now has, or may hereafter have against the other, it being the intention of the parties that henceforth there shall exist as between them only such rights and obligations as are specifically provided for in this Agreement."

Exhibit F, entitled "ADDITIONAL TERMS," states in pertinent part that the "[w]ife agrees to dismiss with prejudice" her claim

against the husband in his pending action in the bankruptcy court. The client and the husband signed the separation agreement on July 5, 2000.

Either before or quickly thereafter, Shulman received a check from the husband made payable to her and the client in the amount of $17,500. Although we cannot ascertain from the record the exact dates upon which Shulman received and endorsed the check, it appears from the materials before us that the check was written by the husband on July 3, 2000, that is, two days before the separation agreement was signed, and that Shulman's endorsement preceded that of the client.

On July 28, 2000, about three weeks after the client and the husband signed the separation agreement and Shulman received the husband's check, the client, acting pro se, and the husband, represented by counsel, signed and filed a stipulation of dismissal in the bankruptcy court. The stipulation provides that the "parties . . . hereby stipulate that this action, and all related claims, may be dismissed, with prejudice."

2. *Shulman's rule 36 denials and explanations.* While Shulman admitted that she and Gannett had discussed discovery matters, she denied that those discussions were at her request. She also denied that she had requested information from the husband's father, bank or agents, or his employees and attorneys concerning his dealings with them. Although Shulman acknowledged that she and Gannett had discussed the bankruptcy and divorce litigation in a general fashion, she denied that they discussed legal strategy at her request or that she benefited from those discussions.

In responding to Gannett's requests for admissions relating to the legal fees owed by the client to Gannett, Shulman acknowledged that she told Gannett that she was aware that the client owed him legal fees for his services to her in the bankruptcy proceeding. However, she denied being aware that the client owed him substantial fees, that is, an amount somewhere between $10,000 to $40,000.

Shulman acknowledged that at the client's request, she had negotiated the agreement without informing Gannett, who was not the client's attorney of record in the divorce action, about the negotiations, terms, and their signing of the agreement. She

went on to answer that she had done so in accordance with the client's request and without any intent to deceive Gannett. Sometime after the agreement had been signed and Gannett inquired about the status of the divorce action, Shulman informed him that it had been settled.

Turning to Gannett's requests for admissions concerning the check sent by the husband and made payable to her and the client, Shulman denied that she had the opportunity to include Gannett as a payee on the settlement check or that she had negotiated or had deposited the check in her IOLTA account. Shulman's denials concerning her handling of the check received from the husband and made payable to her and the client are supported by the client's affidavit, which was before the judge on Shulman's motion for summary judgment.

As set out in that affidavit, the client swore under pains and penalties of perjury that Shulman "never suggested that I not pay . . . Gannett's legal fee." Rather, and according to the client, Shulman "suggested that I work out any dispute I had concerning . . . Gannett's fee directly with [him]." The client also averred in her affidavit that Shulman "did not receive any compensation from the $17,500 paid to me pursuant to the Divorce Agreement by my former husband."[3]

3. *The standard of review.* In taking up Gannett's argument that the judge erred in granting Shulman's motion for summary judgment on his claims of Shulman's intentional interference with his advantageous relationship with the client and deceit, we examine the record to determine whether Shulman sustained

---

[3]Gannett suggests in his brief without argument within the meaning of Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975); *Zora* v. *State Ethics Commn.,* 415 Mass. 640, 642 n.3 (1993), that the client's affidavit was hearsay and should not have been considered. In the first instance, Gannett has not pointed to any particular statement in the client's affidavit that should have been excluded as not having been made on the basis of her personal knowledge. Consequently, it is far from apparent to us, especially in view of Gannett's failure to present argument on his claim of hearsay, that the client's affidavit related to conversations between Shulman and her. Moreover, we find nothing in the trial court docket or the materials included by Gannett in the record appendix to indicate that he filed a motion to strike the affidavit in the trial court. See *Stepan Chem. Co.* v. *Wilmington,* 8 Mass. App. Ct. 880, 880 (1979), where we held that a judge properly could consider exhibits "vulnerable to a motion to strike" where "no such motion was made."

"the burden of affirmatively demonstrating the absence of a triable issue." *Kitras* v. *Zoning Administrator of Aquinnah*, 453 Mass. 245, 251 (2009).[4] From all that appears in the materials before us, Gannett presented nothing to contradict Shulman's rule 36 admissions, the exhibits, or the client's affidavit. Instead, we are left to rely on the allegations set out in Gannett's complaint. See *LaLonde* v. *Eissner*, 405 Mass. 207, 209 (1989) (although in ruling on motions for summary judgment "a judge should view the evidence 'with an indulgence in the [opposing party's] favor,' *Anthony's Pier Four, Inc.* v. *Crandall Dry Dock Engrs., Inc.*, 396 Mass. 818, 822 (1986), . . . the opposing party cannot rest on his or her pleadings and mere assertions of disputed facts to defeat the motion for summary judgment").

4. *Discussion.* a. *Gannett's tort claims.* Whether Shulman was entitled to summary judgment on Gannett's tort claims turns on whether the materials in the record before us lead to the conclusion that "all material facts have been established and [she] is entitled to judgment as a matter of law." *Kitras* v. *Zoning Administrator of Aquinnah*, 453 Mass. at 251, quoting from *Cargill, Inc.* v. *Beaver Coal & Oil Co.*, 424 Mass. 356, 358 (1997).

To sustain a claim of an intentional interference with an advantageous business relationship, Gannett would have to show that Shulman intentionally interfered with his relationship with the client for an improper purpose or by improper means. See *Swanset Dev. Corp.* v. *Taunton*, 423 Mass. 390, 397 (1996). See also *United Truck Leasing Corp.* v. *Geltman*, 406 Mass. 811, 816 n.8 (1990), quoting from *Straube* v. *Larson*, 287 Or. 357, 361 (1979). See also Restatement (Second) of Torts § 767 comments c & d (1979) (plaintiff must prove that the defendant interfered with his advantageous relationship by either interfering with that relationship for an improper rather than legitimate purpose or using improper means which resulted in injury to plaintiff).

As presented in his brief, Gannett's primary assertion appears to be that it was Shulman's failure to inform him of the client's voluntary agreement to the dismissal of the bankruptcy action

---

[4]Based upon Mass.R.A.P. 16(a)(4), we do not consider Gannett's assertions that Shulman failed to file timely her motion for summary judgment and to comply with Superior Court Rule 9A(b)(5). See *Zora* v. *State Ethics Commn.*, 415 Mass. at 642 n.3.

that constituted the improper interference with his economic interests. However, at oral argument, he relied more upon the theory that Shulman's act of turning the settlement funds over to the client constituted the wrongful act. He identifies his economic interest as his right to assert an attorney's lien in both the divorce and bankruptcy proceedings. Gannett's argument fails no matter his theory of Shulman's liability on this count of his complaint.

The undisputed facts establish that Gannett had no right to an attorney's lien in the divorce action. Gannett was not the attorney of record in that action, see G. L. c. 221, § 50,[5] nor do the materials before us show that Gannett had signed any pleading or motion on the client's behalf while representing her on the husband's complaint for divorce. See *Boswell* v. *Zephyr Lines, Inc.*, 414 Mass. 241, 249 (1993) ("[T]he word 'appears' in G. L. c. 221, § 50, should be construed to encompass the signing of pleadings or motions as well as the filing of a notice of appearance. See Mass.R.Civ.P. 11[b]"). Further, there is nothing before us to show that after the client retained Shulman, Gannett gave written notice to either Shulman, the client, or the husband's attorney that he intended to file notice of an attorney's lien. Compare *Malonis* v. *Harrington*, 442 Mass. 692, 701-703 (2004). In that case, the court concluded that Malonis, an attorney, was entitled to recover his fees in quantum meruit from Harrington, his successor attorney, for services provided a client in a tort action prior to Malonis's discharge, where all parties involved reasonably held a "shared expectation" that successor counsel had assumed the responsibility to pay Malonis's reasonable fees and costs out of

---

[5]As provided for in G. L. c. 221, § 50, inserted by St. 1945, c. 397, § 1, which reads in full and with added emphasis:

"From the authorized commencement of an action, counterclaim or other proceeding in any court, or appearance in any proceeding before any state or federal department, board or commission, *the attorney who appears for a client in such proceeding* shall have a lien for his reasonable fees and expenses upon his client's cause of action, counterclaim or claim, upon the judgment, decree or other order in his client's favor entered or made *in such proceeding*, and upon the proceeds derived therefrom. Upon request of the client or of the attorney, the court in which the proceeding is pending or, if the proceeding is not pending in a court, the superior court, may determine and enforce the lien; provided, that the provisions of this sentence shall not apply to any case where the method of the determination of attorneys' fees is otherwise expressly provided by statute."

his contingency fee. *Id.* at 696-698.[6] The record in the instant case demonstrates no such "shared expectation" as to any monies due to Gannett.

To the extent Gannett's argument is that Shulman interfered with his economic interests by endorsing and then turning over the husband's check to the client, he fails to take into account the terms of Exhibit D to the separation agreement, see part 1, *supra*; Shulman's rule 36 responses; the client's affidavit; the fact that Shulman's duty was to the client rather than to him, see *Blue Cross of Mass., Inc.* v. *Travaline*, 398 Mass. 582, 589 (1986); *Frontier Enterprises, Inc.* v. *Anchor Co. of Marblehead*, 404 Mass. 506, 511 (1989); and G. L. c. 221, § 51 ("[A]n attorney at law who unreasonably neglects to pay over money collected by him for and in behalf of a client, when demanded by the client, shall forfeit to such client five times the lawful interest of the money from the time of the demand").

There are also two bases upon which we can dispose of Gannett's contention that Shulman's failure to inform him of the client's intended and actual dismissal of her bankruptcy claim interfered with his right to an attorney's lien in the proceeding. First, we point to Shulman's previously related rule 36 response in which she admitted that, in accordance with the client's request, she had negotiated the separation agreement and its terms without informing Gannett. As put by the judge in his memorandum of decision on Shulman's summary judgment motion, "[a]s counsel for [the client] in her divorce proceeding, [Shulman] had the right

---

[6]The parties' "shared expectation" that Malonis would be paid from Harrington's contingency fee was largely established by the facts that subsequent to his discharge, Malonis gave written notice to the client, to Harrington, and to the tortfeasor that he intended to establish an attorney's lien on any recovery made in the tort action; Harrington made written requests to Malonis for an itemized bill for his legal services; and Harrington assured counsel for the tortfeasor (who, during settlement negotiations, reminded Harrington of Malonis's notice of intent to establish an attorney's lien and expressed concern about that matter) that he, Harrington, "would take care of" Malonis.

Relying upon Harrington's assurances that he intended to pay Malonis a portion of his contingency fee, counsel for the tortfeasor accepted the terms of the settlement and then sent two checks to Harrington in payment of the total amount of the settlement. One check was made payable to the client and the other to Harrington. The client rightfully kept the entire amount of the check. Harrington, however, kept the entire amount of the check made payable to him. See *Malonis* v. *Harrington*, 442 Mass. at 697-698.

and professional obligation to advise [the client] as to what would be in her best interests." See *Travaline, supra*; *Frontier Enterprises, supra*.

Second, in Shulman's rule 36 response she stated that after the agreement had been signed and Gannett asked her about the status of the divorce action, she told him that it had been settled. There is nothing in the materials before us to show that any failure on Shulman's part to advise Gannett of the divorce settlement contrary to the client's request prevented him from protecting any fee to which he was entitled for his services to the client on her claim in the bankruptcy proceeding. The record establishes only that the separation agreement was signed on July 5, 2000, and the stipulation of dismissal was signed on July 28, 2000, and appears to have been docketed in the bankruptcy court on August 4, 2000.

Notwithstanding the fact that it was Gannett's obligation to keep himself informed of the docket in the bankruptcy proceedings in which the client had a claim pending, he presented nothing to show when he last spoke with the client prior to July 28 or checked the docket entries in the bankruptcy court after August 4, 2000. From all that appears in the materials before us, it is unclear whether Gannett instead chose to rely upon Shulman as his source of information.

To prevail on his claim for deceit, Gannett would have to prove that Shulman "made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to his damage." *Danca* v. *Taunton Sav. Bank*, 385 Mass. 1, 8 (1982), quoting from *Barrett Assocs.* v. *Aronson*, 346 Mass. 150, 152 (1963). This count of Gannett's complaint was predicated upon one of the same theories he advanced on his allegations of intentional interference with his advantageous relationship with the client, i.e., that Shulman failed to inform him that she, on behalf of the client, was negotiating a settlement of the divorce action that would result in the dismissal of the client's claim in the bankruptcy proceeding. See *Rood* v. *Newberg*, 48 Mass. App. Ct. 185, 192 (1999), quoting from Restatement (Second) of Torts § 551(1) ("[N]ondisclosure may amount to [an actionable misrepresentation] if a party 'is under a

duty to the other [party] to exercise reasonable care to disclose the matter in question' ''). We have no need to say anything on this point and, instead, rely upon our previous discussion wherein we concluded that Shulman was not under any duty to disclose to Gannett her negotiations and settlement on behalf of the client in the divorce action.

b. *Gannett's postjudgment claim.* It appears from the record before us that Shulman's motion for summary judgment was allowed on June 30, 2003, and that Gannett thereafter timely filed a motion to alter or amend the judgment pursuant to rule 59(e) in which he also requested a hearing. Shulman filed an opposition to the motion on July 23, 2003. Gannett's motion thereafter languished until July 28, 2006, when it was ruled upon with an explanation for the delay as well as a succinct statement of the reason for its denial: "Because this motion was not brought to my attention until June, 2006, I have had to review the file. Having done so, I remain convinced that the [plaintiff] cannot establish his claims for interference with contractual relations and deceit."

A motion brought under rule 59(e) is addressed to the judge's sound discretion. See *R.W. Granger & Sons, Inc.* v. *J & S Insulation, Inc.*, 435 Mass. 66, 79 (2001). In Gannett's motion and his argument on appeal from its denial, he argues that *Malonis* v. *Harrington*, 442 Mass. at 696-698, supports the allegations of his complaint. Based upon our previous discussion of the inapplicability of *Malonis* to Gannett's complaint, see part 4a and note 6, *supra*, we see no error in the judge's denial of Gannett's rule 59(e) motion.

*Judgment affirmed.*

*Denial of the rule 59(e)*
*motion affirmed.*