APPEALS COURT 
 
 PRISM GROUP, INC. vs. SLINGSHOT TECHNOLOGIES CORPORATION

 
 Docket:
 22-P-1191
 
 
 Dates:
 April 2, 2024 - October 9, 2024
 
 
 Present:
 Meade, Englander, & Hodgens, JJ.
 
 
 County:
 Middlesex
 

 
 Keywords:
 Contract, What constitutes, Validity, Performance and breach, Construction of contract.
 
 

             Civil action commenced in the Superior Court Department on April 22, 2014.
            Following review by a panel of this court, 97 Mass. App. Ct. 1112 (2020), the case was heard by Joshua I. Wall, J.; entry of an amended judgment was ordered by him; and a motion for a new trial, filed on July 29, 2022, was heard by him.
            Maurice R. Mitts, of Pennsylvania (Geoffrey Paul Huling, of Pennsylvania, also present) for the defendant.
            Paul K. Flavin (Brendan R. Pitts also present) for the plaintiff.
            ENGLANDER, J.  In this contract action, the plaintiff, Prism Group, Inc. (Prism), asserts that the defendant, Slingshot Technologies Corporation (Slingshot), owes it sales commissions on revenue that Slingshot received from two customers that Prism recruited for Slingshot.  It is not disputed that Prism recruited these two customers (thereby completing its performance under the contracts) or that Slingshot owed some sort of commission for Prism's efforts; rather, the key point of disagreement is over duration -- for what period were commissions required to be paid?  After a jury-waived trial, a judge of the Superior Court determined that the agreements with respect to the two customers did not expressly include a duration, supplied a "reasonable duration," and concluded that the contracts required Slingshot to make commission payments to Prism as long as the two customers continued to do business with Slingshot.  The judge also found that Slingshot committed breaches of both agreements by failing to pay the agreed-on commissions.  A judgment entered against Slingshot in the amount of $4.1 million, and the judge, in separate orders, denied Slingshot's postjudgment motions.
            On appeal, Slingshot argues that the contracts either were terminable at will by either party or had a three-year term, and, in any event, that the judge erred in supplying a term that (Slingshot asserts) required Slingshot to pay commissions "in perpetuity."  Slingshot also argues that in finding breaches of the contracts, the judge incorrectly determined the applicable commission rates under both agreements.  As discussed below, we conclude that a contract to make payments for an indefinite duration but that is tied to a defined event -- as here, the termination of business relations between identified entities -- can be enforced as such and is not necessarily terminable at will.  We perceive no error in the judge's conclusions as to the duration of the contracts at issue, or as to any other ground Slingshot raises, and accordingly we affirm the amended judgment and the order denying Slingshot's postjudgment motion for a new trial.
            Background.[1]  The defendant, Slingshot, provides secure facsimile services to customers in the healthcare industry.  Customers use Slingshot's services, for example, to send and receive facsimiles regarding patient needs or care.  Adam Pasternack is Slingshot's principal and the principal of another company, Rocket Messaging, Inc. (Rocket).  The plaintiff, Prism, is an independent sales company with contacts in the healthcare industry.  Nicholas Baran is Prism's owner and sole employee.
            Pasternack and Baran first met in 2003, and Pasternack subsequently hired Prism to provide sales services -- first for Rocket and later for Slingshot, as discussed below.  Their  agreement essentially involved Baran soliciting and procuring customers for facsimile services.  Because Prism's contract with Pasternack's Rocket company preceded the two contracts at issue, its terms have some relevance to the issues before us.  In particular, in August of 2004 Pasternack and Baran, through their companies, entered into a written agreement for Prism to procure broadcast facsimile customers for Rocket (Rocket agreement).  The Rocket agreement was drafted by Pasternack and included a provision that the agreement was subject to automatic annual renewal but could be terminated by either party on thirty days' written notice.  The agreement also provided, "In the event of termination by either party for any reason, commissions shall continue to be paid to PRISM on all revenue billed and collected by [Rocket] on PRISM's customers during and after the termination period."
            1.  The Curaspan agreement.  That brings us to the first of the two contracts at issue, involving a customer known as Curaspan, Inc. (Curaspan).  In January of 2006, Baran approached Pasternack with Curaspan as a potential new customer for Rocket, but Pasternack instead used the Curaspan opportunity for Slingshot.  Baran and Pasternack thereafter exchanged e-mail messages regarding how Prism would be compensated for securing the Curaspan business.  The parties settled on a fifteen percent commission rate, as memorialized in a September 2006 e-mail message between Pasternack and Baran (Curaspan agreement):  "We received payment from Curaspan on the invoice . . . .  Your commission of $827.37 (15% x 5515.80) is being mail[ed] out today."
            As to Curaspan, there is no dispute that the parties had a contract obligating Slingshot, at least initially, to pay Prism fifteen percent of the revenue Slingshot received.  Slingshot paid that fifteen percent commission for roughly eighteen months.  In February of 2008, however, Pasternack told Baran that he intended to reduce Prism's commission on the Curaspan account to ten percent.  Baran promptly objected to the proposed modification, in writing.  Slingshot did not change the commission rate at that time and continued to make payments at the fifteen percent rate.
            A little over a year later, in May 2009, Slingshot did in fact reduce Prism's commission, after informing Baran via e-mail message that the commission would "be a fixed monthly payment of $2,500 (approximately [nine percent]) until further notice."  From May 2009 to December 2012, Slingshot paid Prism the flat $2,500 monthly commission on the Curaspan account.  Then, in December 2012, Slingshot informed Baran that Slingshot would no longer pay Prism commissions on the Curaspan account even though Curaspan remained a Slingshot income-producing customer.
            Prism ultimately received a total of $161,704 in commissions on the Curaspan account.  As of the time of trial, Slingshot had received over $9 million in revenue from Curaspan.
            2.  The eClinical agreement.  In 2013, Prism introduced eClinical Works, LLC (eClinical), as a new customer to Slingshot.  In April 2013, Baran sent Pasternack an e-mail message to "confirm[] [Pasternack's] agreement to pay a commission rate of [ten percent] based on the attached quote for [eClinical]."  Pasternack promptly replied, "[C]onfirmed" (eClinical agreement).
            Also during 2013 the parties were negotiating a different commission agreement that would have governed the parties' relationship for new business (2013 negotiations).  Proposals were exchanged, and were presented in evidence.  The parties dispute whether  the proposed 2013 agreement was finalized, but as the trial judge explained, that dispute is not relevant to our decision.  The parties' working relationship ended soon after the negotiations, in December 2013.
            Although eClinical did become a large customer for Slingshot, Slingshot paid almost nothing in commissions to Prism based on eClinical business.  As of the trial in 2022, Slingshot had received over $29 million for its services from eClinical.  Prism received a single commission payment of $139 for the account, which was paid on January 15, 2014.
            3.  Judge's decision.  Prism's breach of contract claims based upon the Curaspan and eClinical agreements were tried before a judge of the Superior Court, jury waived, in 2022.  Baran was the only witness.  Pasternack did not testify, although he apparently was present in the court room throughout trial.  After the trial, the judge found that Slingshot breached both agreements as follows.
            a.  Contract terms.  The judge found that the parties formed two agreements based on the e-mail messages described above.  Under those agreements, Slingshot would pay commissions at a rate of fifteen percent of Curaspan revenue and ten percent of eClinical revenue.  The judge further found that the contracts were silent on the issue of duration, and accordingly the judge went through the analysis to supply a "reasonable" term, considering "the nature of the contract, the probable intention of the parties, and the attendant circumstances."  Plymouth Port, Inc. v. Smith, 26 Mass. App. Ct. 572, 575 (1988).  Ultimately, the judge found that "commissions will be paid at the [agreed] rate for as long as Slingshot receives income from the customer for providing facsimile services, and commissions will continue at the same rate after either side ends the business relationship."
            In reaching his conclusion, the judge considered several pieces of evidence that bore on the parties' course of dealing and intent, the most significant of which was an April 2011 e-mail exchange where Baran urged Pasternack not to further reduce Prism's commission for Curaspan.  In that e-mail message, Baran explained,
"I brought the deal to you and you agreed to accept it on the commission promise you originally made:  to pay me [fifteen percent] of revenue. . . .  Most important of all:  you promised to continue paying me for as long [as] you made revenue from this account which has been enormous and very profitable to date.  And that's despite the fact that you reduced my commission twice, eventually down to $2,500."  (Emphasis added.)
The judge noted that Pasternack's response, sent less than forty minutes later, "did not dispute or contest Baran's memory of Pasternack's statements."  Ultimately, the judge found as fact that when the parties "negotiated the Curaspan [a]greement in 2006, Pasternack told Baran that Slingshot would pay commissions as long as it received revenue from Curaspan."[2]
            In his rulings, the judge rejected Slingshot's contention that the contracts were terminable at will, reasoning that "[t]he contracts would be unilateral, illusory, and unreasonable if they gave Slingshot the power to terminate for no reason after the other side performed."  The judge did not, however, address the contention that Slingshot now presses on appeal, which is that the judge's ruling leads to contracts that (allegedly) have no end date, and are for that reason unenforceable.
            b.  Breach and damages.  The judge found that Slingshot first breached the Curaspan agreement when it stopped paying Prism the fifteen percent commission in May 2009.  The judge reasoned that Prism never agreed to the new flat rate of $2,500 per month and that Prism did not receive consideration for a modification.  As to eClinical, the judge found that Prism breached the agreement by failing to pay commissions almost immediately after eClinical began as a customer.
            Based on those findings, the judge concluded that Prism was entitled to over $1 million in damages under the Curaspan agreement and nearly $3 million under the eClinical agreement, for a total of $4.1 million in damages, plus interest and costs.
            4.  Postjudgment motions.  After the original judgment entered, Slingshot filed postjudgment motions, including a motion for a new trial or to alter and amend the court's findings (postjudgment motion).  Slingshot argued that it did not breach the Curaspan agreement because Prism agreed to the modification and later termination of its commissions.  As to eClinical, Slingshot argued that Prism's commission rate depended on the rates that eClinical agreed to pay to Slingshot.  Slingshot also argued that the judge erred in concluding that the agreements were not terminable at will, and in determining that a term lasting "in perpetuity" was a reasonable duration.
            At the hearing on the postjudgment motion, Slingshot's counsel argued for the first time that the eClinical agreement only required Slingshot to pay Prism commissions for three years.  Slingshot's new argument was based on the written quote Slingshot prepared with respect to eClinical business (Slingshot quote), a document Baran had attached to his e-mail message to Pasternack by which Baran confirmed Prism's ten percent eClinical commission.  The Slingshot quote, which was in evidence at trial, referenced a "Service Term" of three years.  In response the judge noted that Slingshot had never before made an argument for a three-year term, or referenced the quote for that purpose.  The judge denied the postjudgment motion, and this appeal followed.
            Discussion.  On review of a jury-waived trial, we accept the judge's factual findings unless they are clearly erroneous, but review any legal conclusions de novo.  See U.S. Bank Nat'l Ass'n v. Schumacher, 467 Mass. 421, 427 (2014).  Our review of the denial of the postjudgment motion is for abuse of discretion.  See David v. Kelly, 100 Mass. App. Ct. 443, 447 (2021) (motion for new trial); Gannett v. Shulman, 74 Mass. App. Ct. 606, 615 (2009) (motion to alter or amend).
            On appeal, Slingshot's principal argument is that the judge erred in defining the duration of the contracts -- "for as long as Slingshot receives income from the customer for providing facsimile services" -- contending instead that where the parties did not supply a duration, the law requires the contracts to be terminable at will.  Before turning to the duration issue, however, we address Slingshot's arguments that are specific to each of the contracts at issue.
            1.  The Curaspan agreement.  Slingshot argues that the Curaspan agreement was modified in 2009, with a new commission rate of $2,500 per month, and that the judge erred in concluding otherwise.  Slingshot argues that Prism agreed to the reduction in commission, citing the fact that after Slingshot started paying $2,500 per month in 2009, Prism subsequently billed Slingshot at that rate and accepted payment.
            The problem with Slingshot's argument is that the judge specifically found that Prism did not agree to the 2009 reduction in commission, but instead accepted the $2,500 monthly payments because it needed the money.  The decision to reduce Prism's commission was first effected unilaterally by Slingshot.  The judge found that "Slingshot offered no consideration for its modification and Prism never agreed to the new rate."  The finding that Prism never agreed to the new rate was sufficiently supported by the evidence, so it was not clearly erroneous.  See Springgate v. School Comm. of Mattapoisett, 11 Mass. App. Ct. 304, 309-310 (1981), S.C., 392 Mass. 858 (1984), quoting United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948).  To the extent Slingshot is arguing that Prism's actions in subsequently billing for and then accepting the $2,500 payments required a determination that the contract was modified as a matter of law, we are not persuaded.  Mere acceptance of a partial payment of monies owed under a contract does not waive the entitlement to the full amount due.  See Williams v. B & K Med. Sys., Inc., 49 Mass. App. Ct. 563, 570 (2000), citing Cadle Co. v. Hayes, 116 F.3d 957, 962 (1st Cir. 1997).  Nor, under the circumstances, was the judge required to conclude that Prism waived its contractual rights by subsequently issuing bills at the $2,500 rate.  Prism had previously expressly objected to a change in the commission rate, and as the judge noted, Prism never expressly agreed.  Based on the evidence the judge of course could have found a waiver of Prism's rights, but he instead found to the contrary.[3]
            2.  The eClinical agreement.  Slingshot also argues that the judge misconstrued its agreement regarding eClinical.  The judge found that Slingshot agreed to pay Prism a ten percent commission on eClinical revenue, based upon an April 26, 2013, e-mail message from Baran to Pasternack in which Baran "confirm[ed] [Pasternack's] agreement to pay a commission rate of [ten percent] based on the attached quote for [eClinical]," to which Pasternack replied, "[C]onfirmed."
            As to the eClinical agreement, Slingshot again argues that the judge committed clear error, and that instead the judge should have concluded that the commission rate Slingshot was to pay Prism would vary based upon the rate that eClinical paid Slingshot for facsimile services.  We are not persuaded that the judge erred.  Slingshot's argument is based upon the Slingshot quote that Baran attached to his April 26, 2013, e-mail message; however, Baran's April 26, 2013, e-mail message stated a commission rate of ten percent of the revenue that Slingshot received from eClinical, regardless of the price that eClinical paid to Slingshot for facsimile services.  Furthermore, Slingshot's reliance on the 2013 negotiations as to a commission schedule that would govern the parties' relationship going forward is also misplaced.  As to those negotiations, the judge expressly found that the proposed commission schedule (which would have set a variable commission rate for Prism with respect to new customers) had "no effect on the eClinical [a]greement."  The judge explained that the eClinical agreement was separately negotiated, and that even if the 2013 negotiations had resulted in a finalized agreement, eClinical would have been treated as an "individual case basis" subject to a separate agreement.
            Finally we note, with respect to the eClinical agreement, that Slingshot does not appear to dispute that it agreed to pay some commission for the eClinical business, but that it did not do so, paying a total sum of $139.  Slingshot's arguments as to eClinical ring hollow.
            3.  Duration.  That brings us to the issue of the contracts' duration.  The judge ruled that neither contract contained a provision governing duration, and the judge went on to supply the "missing term," concluding that under both contracts commissions would be due for so long as Slingshot receives income from the customer.  As of the time of trial in 2022, Slingshot continued to receive substantial revenues from both Curaspan and eClinical, meaning that Slingshot's obligations to Prism continued unabated past the conclusion of trial.
            On appeal, Slingshot's challenges to the judge's duration term raise primarily questions of law.  Slingshot argues that the judge has created "perpetual" contracts, and that such  contracts are legally untenable.  It posits that a contract without a durational term is "not presumed to last in perpetuity," and instead should be construed as one "terminable at will by either party."
            In this case, Slingshot's legal arguments fail for at least two reasons.  First, it is not correct to say that the judge's term renders the contracts "perpetual."  To be sure, the term is indefinite.  But the obligation has a defined end point, which is when Slingshot ceases receiving revenue from the client.  That contingency could already have happened, or it could be years away, but it is reasonable to believe that it will happen.[4]
            Second, and perhaps more importantly, contracts of this type, where one party has completed performance but is entitled to payments for an indefinite future term, have been enforced in the courts in Massachusetts and elsewhere.  For example, in Edmund D. Hewins, Inc. v. Marlboro Cotton Mills, 242 Mass. 282, 284 (1922), the Supreme Judicial Court considered a contract that a manufacturer would pay its selling agent "the commission on every pound of tire fabric that we ever ship, as long as we ever ship it," for any new customer solicited by the agent.  The court held that the jury were free to find that the parties entered into "a definite contract [for the manufacturer] to pay [the agent] a commission for all time on all sales made in the future to the customer who became such by [the agent's] efforts."  Id. at 285.  See Quinn v. Mar-Lees Seafood, LLC, 69 Mass. App. Ct. 688, 703 (2007) (contract that plaintiff would receive royalties on defendant's sales to customers recruited by plaintiff enforceable).
            Perhaps the most well known of such cases comes from outside of Massachusetts.  In Warner-Lambert Pharm. Co. v. John J. Reynolds, Inc., 178 F. Supp. 655 (S.D.N.Y. 1959), aff'd, 280 F.2d 197 (2d Cir. 1960) (Warner-Lambert), the court construed two contracts from the 1880s that required a manufacturer to make periodic payments to the creator of the Listerine formula, in exchange for the right to manufacture and sell the product.  See Warner-Lambert, 178 F. Supp. at 658.  After the Listerine formula became widely known decades later, the manufacturer's successor sought a declaration that it was no longer required to make payments under the agreements.  See id. at 660-661.  The court rejected the manufacturer's argument that its obligation to pay was tied to the secrecy of the formula, holding instead that the obligation continued as set forth in the contracts -- until the manufacturer ceased to manufacture or sell Listerine.  See id.  In so holding, the court explained that although the contracts at issue did not provide a fixed termination date, they appropriately conditioned the manufacturer's obligation on an event that would necessarily terminate the contract.  See id. at 661-662.  In short, the case law demonstrates that contracts that terminate on the occurrence of a specified event at an indefinite time can be enforced and are not necessarily terminable at will.
            We recognize, as Slingshot argues, that in some circumstances -- for example, when a contract requires ongoing performance by both parties -- courts have construed a contract that lacks a duration term to be terminable at will.[5]  For instance, in Simons v. American Dry Ginger Ale Co., 335 Mass. 521 (1957), the court concluded that the parties' contract for the repair of soft drink bottle cases, which stated an agreed-upon weekly volume but which lacked a duration term, "might fairly be construed as one terminable at will by either party upon reasonable notice" (quotation and citation omitted).  Id. at 524.  We think, however, that such circumstances are sufficiently different from those presented here.  Prism already fully performed, by successfully procuring new clients for Slingshot.  See Quinn, 69 Mass. App. Ct. at 703 (agreement not terminable at will when parties agreed otherwise; plaintiff, who fully performed by successfully introducing customer to defendant, entitled to royalties for resulting profits realized by defendant).  Indeed, in expressly rejecting the argument that the agreements were terminable at will, the trial judge explained that "Slingshot's interpretation -- that it could terminate the contract[s] for no reason after Prism performed -- is nonsensical."  Although the notion of a "perpetual" agreement is not acceptable in the law, the notion that a party can agree to pay over a period of time for someone's performance that has been completed is neither novel nor troublesome -- many royalty agreements operate on such basis.  See, e.g., Aronson v. Quick Point Pencil Co., 440 U.S. 257, 259 (1979) ("contract to pay royalties to a patent applicant, on sales of articles embodying the putative invention, for so long as the contracting party sells them, if a patent is not granted" was enforceable).  See also 1 R.A. Lord, Williston on Contracts § 4:23 (4th ed. 2007) ("More commonly, the courts will interpret the promise to mean some period short of infinity").  In short, the contracts as construed by the trial judge are consistent with the law.  See 3 E.A. Farnsworth, Contracts § 7.20, at 266 (4th ed. 2019 & Supp. 2020) (where durational term omitted, court may fashion appropriate term between termination at will and perpetual duration).
            We turn then to whether the judge's conclusion on the duration issue is appropriate on the facts of this case.  If an otherwise unambiguous contract provision is missing a term, such as one for duration, the trial judge is tasked with filling in the omitted term in accordance with the intent of the parties.  See Diamond Crystal Brands, Inc. v. Backleaf, LLC, 60 Mass. App. Ct. 502, 506 (2004).  See also Plymouth Port, Inc., 26 Mass. App. Ct. at 575-576.  If the judge finds that the parties agreed that the contract would terminate at an ascertainable time, the judge will supply the missing clause consistent with the parties' intent.  See Warner-Lambert, 178 F. Supp. at 661.  If the judge finds that the parties did not consider or agree on a particular term, the judge will supply a term of reasonable duration.  See Plymouth Port, Inc., supra.  "What is a reasonable period of time depends on the nature of the contract, the probable intention of the parties, and the attendant circumstances."  Id. at 575.  "[T]he court should supply a term which comports with community standards of fairness and policy rather than analyze a hypothetical model of the bargaining process" (citation omitted).  President & Fellows of Harvard College v. PECO Energy Co., 57 Mass. App. Ct. 888, 896 (2003).
            Here the judge found that the contracts did not have a duration term, so we accordingly proceed to determine whether the duration he supplied was reasonable.  It is.  As discussed above, the judge found that Pasternack actually stated to Baran -- at least with respect to Curaspan -- that commissions would last as long as Slingshot received revenue from that customer.  Pasternack sat through trial but did not take the stand or offer evidence to dispute this testimony.[6]  Similarly, when Baran indicated in an April 2011 e-mail exchange that the parties agreed Prism would receive commissions "as long as the [Curaspan] account flowed revenue," Pasternack did not dispute the assertion.  The judge also properly considered the parties' course of dealing, including the 2004 Rocket agreement that stated that commissions would continue after the termination of the agreement[7] and the 2013 negotiations where Pasternack proposed that Prism would be "commissioned residually" on accounts for new clients obtained by Prism.  Furthermore, the judge considered the nature of the parties' relationship and that "[n]either party introduced evidence to suggest that long-term commissions were unreasonable, inconsistent with industry standards, or contrary to community standards of fairness and policy."  There was no error in the judge's reasoning.
            Finally, Slingshot argues in the alternative that we should determine as a matter of contract construction that the eClinical agreement is subject to a three-year term.  This argument is based entirely on the Slingshot quote that Baran appended to his April 26, 2013, e-mail message to Pasternack.  As to the eClinical agreement, this three-year term argument was raised for the very first time posttrial, at the hearing on Slingshot's postjudgment motion.  The judge rejected the argument, and we discern no error of law or abuse of discretion.  Among several reasons, we note that Slingshot did not present any testimony or documentary evidence to support its position, other than the attachment itself.  The judge found that Baran attached the quote merely as proof that Baran was pursuing business with eClinical, not for the purpose of setting a duration as Slingshot now argues.[8]
            Conclusion.  The amended judgment entered December 1, 2022, is affirmed.  The order entered December 13, 2022, denying the postjudgment motion for a new trial, is affirmed.
So ordered.
 
footnotes

 
            [1] This matter is before this court for a second time.  Details regarding the prior proceedings, including the earlier trial, may be found in the unpublished memorandum and order issued by a different panel of this court, see Prism Group, Inc. v. Slingshot Techs. Corp., 97 Mass. App. Ct. 1112 (2020).  Following remand, a different judge of the Superior Court held a jury-waived trial on Prism's claims with respect to the two customers at issue in this appeal.  We recite the facts as found by the judge after the second trial and those based on other undisputed evidence in the record, saving some facts for our later discussion.  See Schultz v. Tilley, 91 Mass. App. Ct. 539, 540 (2017).
            [2] The judge also relied on evidence of the parties' course of dealing, including the 2004 Rocket agreement that required Rocket to pay commissions to Prism on all revenue even after termination of that agreement by either party for any reason.  Also, the judge considered the 2013 negotiations where Pasternack proposed that Prism would be "commissioned residually on all accounts sold" as long as certain benchmarks were met.
            [3] Slingshot argues that Prism's opportunity to continue its business relationship with Slingshot constituted adequate consideration for a modification of the Curaspan commission.  Likely it could have, but Slingshot's argument fails nonetheless where the judge expressly found that Prism did not agree to the modification.
            [4] As one court aptly explained,
"The word 'perpetuity' is often applied very loosely to contractual obligations.  Indiscriminate application of the term serves only to confuse.  The mere fact that an obligation under a contract may continue for a very long time is no reason in itself for declaring the contract to exist in perpetuity or for giving it a construction which would do violence to the expressed intent of the parties."
Warner-Lambert Pharm. Co. v. John J. Reynolds, Inc., 178 F. Supp. 655, 661 (S.D.N.Y. 1959), aff'd, 280 F.2d 197 (2d Cir. 1960).
            [5] Article 2 of the Uniform Commercial Code, governing transactions in goods, adopts this approach.  See G. L. c. 106, § 2-102.  As enacted in Massachusetts, art. 2 dictates that "[w]here the contract provides for successive performances but is indefinite in duration it is valid for a reasonable time but unless otherwise agreed may be terminated at any time by either party."  G. L. c. 106, § 2-309 (2).
            [6] Certain of the judge's findings suggest that the parties did in fact reach an agreement (albeit not reduced to writing) that Slingshot's obligation to pay would continue as long as Curaspan and eClinical remained customers.  The judge did not make this finding expressly, however, and instead treated the contract as if it was missing a duration term.
            [7] The judge was free to consider the Rocket agreement as some evidence of the parties' course of dealing.  Although Slingshot argues that corporations are ordinarily regarded as distinct legal entities, see Scott v. NG U.S. 1, Inc., 450 Mass. 760, 766 (2008), the judge here looked at the prior agreement reached between the same principals -- Pasternack and Baran -- regarding the same type of business, to determine what would be reasonable.  
            [8] As to the Curaspan agreement, the argument that it was subject to a three-year term was first raised at oral argument on appeal and, therefore, is waived.  See Carey v. New England Organ Bank, 446 Mass. 270, 285 (2006).  However, even if we reached the merits of the argument, it would fail for essentially the same reasons stated above with respect to eClinical.