APPEALS COURT 
 
 CROWN COMMUNITIES, LLC vs. PHILIP AUSTIN, trustee,[1] & another[2]

 
 Docket:
 23-P-580
 
 
 Dates:
 April 17, 2024 – December 3, 2024
 
 
 Present:
 Vuono, Rubin, & Walsh, JJ.
 
 
 County:
 Barnstable
 

 
 Keywords:
 Manufactured Housing Community. Real Property, Right of first refusal. Lis Pendens. Contract, Interference with contractual relations. Consumer Protection Act, Unfair act or practice. Civil Rights, Coercion. Practice, Civil, Findings by judge, Judgment, Motion to amend. Judgment, Amendment.
 
 

             Civil action commenced in the Superior Court Department on February 20, 2020. 
            The case was heard by Michael K. Callan, J., and a motion to alter or amend the judgment was considered by him.
            Thomas W. Aylesworth for Pocasset Park Association, Inc.
            Walter B. Sullivan for the plaintiff.
            Ellen J. Peterson, Assistant Attorney General, for the Attorney General, amicus curiae, submitted a brief.
            VUONO, J.  The primary issue raised in this appeal is whether the resident owners of manufactured housing units in a manufactured housing community (park) validly exercised their statutory right of first refusal to purchase the land on which the park is situated.  See G. L. c. 140, § 32R (c).  As we discuss in more detail below, the plaintiff, Crown Communities, LLC (Crown Communities), entered into a purchase and sale agreement to buy the park from defendant Philip Austin, as trustee of the Charles W. Austin Trust (trust).  When some park residents learned of the proposed sale, they formed an association, defendant Pocasset Park Association, Inc. (association), to exercise their statutory right of first refusal.  The association submitted a purchase and sale agreement to Austin, as trustee, who, on the advice of an attorney, executed the purchase and sale agreement with the association.
            To determine which purchase and sale agreement was valid, Crown Communities brought a declaratory judgment action against the trust and the association.[3]  The association counterclaimed for tortious interference with contractual relations, violation of G. L. c. 93A, and violation of the Massachusetts Civil Rights Act, G. L. c. 12, §§ 11H, 11I (MCRA), and also requested a declaratory judgment.[4]  Following a jury-waived trial, a Superior Court judge concluded that the association did not validly exercise its statutory right of first refusal and issued a declaratory judgment in favor of Crown Communities.  The trial judge reasoned that (1) the association did not represent the requisite number of the park's resident owners and (2) the requisite number of resident owners did not support the association's purchase of the park.  The judge also found in favor of Crown Communities on the association's counterclaims.
            Thereafter, the association filed a motion to amend the judgment, asserting that the judge's analysis of whether the association validly exercised its statutory right of first refusal was flawed because he imposed an improper heightened burden on the association and committed a mathematical error in calculating how many resident owners supported the association's purchase of the park.  The judge denied the motion, and the association appealed from the judgment and the order on the motion to amend.  We affirm in part, vacate in part, and remand.[5]
            Background.  1.  Statutory background.  "[M]anufactured housing communities provide a viable, affordable housing option to many elderly persons and families of low and moderate income" (citation omitted).  Blackman's Point Homeowners' Ass'n, Inc. v. Call, 103 Mass. App. Ct. 711, 713 (2024).  However, renting land and placing a manufactured housing unit in a manufactured housing community also comes with risks.  See id.  Because manufactured housing units often cannot be relocated, the residents of a manufactured housing community are "at the peril of their landlord[]" should their landlord or a subsequent purchaser of the land decide to discontinue the community.  Greenfield Country Estates Tenants Ass'n v. Deep, 423 Mass. 81, 86 (1996).  "To protect this vulnerable community, the Legislature enacted the Manufactured Housing Act, G. L. c. 140, §§ 32A-32S [act]," Blackman's Point Homeowners' Ass'n, Inc., supra, which "enables residents of manufactured housing communities to purchase the land on which their homes exist" through a right of first refusal, Greenfield Country Estates Tenants Ass'n, supra.
            The act includes provisions specifying when and how an owner must give notice to residents of the intention to sell, see G. L. c. 140, § 32R (a), and when and how an owner must give notice to residents of a bona fide offer, see G. L. c. 140, § 32R (b).  The act then provides that "[a] group or association of residents representing at least fifty-one percent of the manufactured home owners residing in the community which are entitled to notice under paragraph (b) shall have the right to purchase . . . the said community for purposes of continuing such use thereof, provided" that the group or association satisfies certain criteria.  G. L. c. 140, § 32R (c).[6]  The group or association must
"(1) submit[] to the owner reasonable evidence that the residents of at least fifty-one percent of the occupied homes in the community have approved the purchase of the community by such group or association, (2) submit[] to the owner a proposed purchase and sale agreement or lease agreement on substantially equivalent terms and conditions within forty-five days of receipt of notice of the offer made under subsection (b) of this section, (3) obtain[] a binding commitment for any necessary financing or guarantees within an additional ninety days after execution of the purchase and sale agreement or lease, and (4) close[] on such purchase or lease within an additional ninety days after the end of the ninety-day period under clause (3)."
Id.  At trial, the parties agreed that clause (1) required the association to submit to the trust reasonable evidence that the resident owners of at least fifty-one percent of the occupied homes in the park approved the purchase of the park by the association.[7]  While this interpretation reads a word into the act that is not there, whether the parties' interpretation is correct is not before us given their agreement, and we take no position on whether they are correct.  See Smith v. Smith, 5 Mass. App. Ct. 874, 874 (1977) (issue expressly waived below was not before court on appeal).
            2.  Factual background.  We summarize the relevant facts as found by the judge, supplemented where necessary by undisputed documentary evidence.  The park is a manufactured housing community located in the town of Bourne, in a section known as Pocasset.  The park is owned by the trust and managed by Austin, who testified that, among other duties, he provides routine maintenance, collects the rent, and maintains the rent roll.  On November 15, 2019, Crown Communities, a limited liability company that is in the business of acquiring and operating manufactured housing communities, entered into a purchase and sale agreement to buy the park from the trust for $3.8 million in cash.  Crown Communities planned to continue operating the park as a manufactured housing community, and the sale was not going to result in a change of use or discontinuance.  On November 20, 2019, the trust sent notice of the proposed sale, including a copy of the purchase and sale agreement, to the persons known by the trust to be residing in the park.
            Upon receiving the notice, several park residents became alarmed and began to meet to discuss options.  By the end of December 2019, a group of residents had coalesced, began to receive assistance from the Cooperative Development Institute, Inc. (CDI), a nonprofit organization that assists manufactured housing communities in acquiring and operating their communities as cooperatives,[8] and formed the association.  Around that time, some residents, with assistance from CDI, began to ask other residents to (1) sign membership agreements to join the association and (2) sign a petition to invoke the right of first refusal.[9]  On January 2, 2020, an attorney for the association sent a letter to Austin, as trustee, representing that (1) park residents, through the association, were exercising their statutory right of first refusal and (2) an attached petition contained "signatures of at least [fifty-one percent] of the residents of the [park] indicating a desire to move forward with the [association's] purchase."  The attorney also attached a proposed purchase and sale agreement to the letter.  Unlike Crown Communities's purchase and sale agreement, the association's purchase and sale agreement contained a mortgage contingency.  Five days later, on January 7, 2020, Austin, as trustee, executed the purchase and sale agreement with the association on the advice of an attorney and notified Crown Communities of that fact.
            Subsequently, when Crown Communities learned of the association's attempted exercise of the statutory right of first refusal, it began to send letters to park residents and to visit and speak with residents to win their support.  Among other things, Crown Communities specifically asked residents to withdraw their support from the association.  While the judge did not make detailed findings regarding any specific statements that Crown Communities made to any residents, documentary evidence shows that Crown Communities sent a letter to some residents stating that they would lose rent control protection if the association purchased the park and offering gift cards and a "Crown Guarantee," which included financial incentives, to residents who signed an enclosed form stating that they wanted Crown Communities, not the association, to purchase the park.[10]  Around the time that Crown Communities was visiting and speaking with residents, it also commenced this action.
            Discussion.  1.  The statutory right of first refusal.  As noted, the question before us is whether the association validly exercised its statutory right of first refusal.[11]  Because the judge made various errors of law and a mathematical error in calculating the number of resident owners who supported the association's purchase of the park, we cannot answer that question.  Instead, we must vacate the judgment and, as we explain more fully below, remand the case for the judge to make findings on issues not previously addressed and to reconsider other findings in light of the standards we set forth below.[12]  See, e.g., South Boston Elderly Residences, Inc. v. Moynahan, 91 Mass. App. Ct. 455, 467 (2017) (in jury-waived trial, remanding for reconsideration where judge's findings may have been based on incorrect legal standard).  See also, e.g., Bruno v. Alliance Rental Group, LLC, 103 Mass. App. Ct. 170, 173 n.5 (2023) (similar).
            The judge focused on two requirements of G. L. c. 140, § 32R (c):  (1) whether the association represented fifty-one percent of the resident owners who were entitled to notice and (2) whether the association submitted to the trust reasonable evidence that the resident owners of at least fifty-one percent of the occupied homes in the park approved the purchase of the park by the association.  On these points, the association's evidence included the petition signed by park residents.
            In addressing the first issue, the judge did not consider the petition and instead looked to how many signed membership agreements the association had collected.  He found that there was "no credible evidence" as to how many signed membership agreements the association had collected or whether they were signed by resident owners versus residents.  Based on his findings regarding the signed membership agreements, the judge concluded that there was no credible evidence that the association represented fifty-one percent of the resident owners.  The judge erred in this regard by conflating (1) whom the association represented with (2) who was a member of the association.  The act requires that a group or association represent fifty-one percent of a manufactured housing community's resident owners, not that fifty-one percent of a manufactured housing community's resident owners be members of the group or association.  See G. L. c. 140, § 32R (c).[13]  See Chin v. Merriot, 470 Mass. 527, 537 (2015) (we do not read into statutes provisions that Legislature did not see fit to include).  The judge did not make a finding on the pertinent question whether the association represented fifty-one percent of the resident owners, and we remand for findings on that question.  See n.17, infra.
            In addressing the second issue, whether the association submitted to the trust reasonable evidence that the requisite number of resident owners supported the association's purchase of the park, the judge did consider the petition but made other errors.  The first error was a mathematical one.  The judge found that there were eighty-one units in the park and therefore the association needed signatures from forty-one resident owners.  He then found that the petition contained forty-nine signatures.  Of the forty-nine signatures that the judge counted, he found that only thirty-five were from resident owners and that four of those thirty-five later rescinded their signatures, reducing the total number of resident owners in favor of the purchase to thirty-one.[14]  Consequently, the judge concluded that the association had not met its burden of proof.  However, the judge erred when he found that the petition contained forty-nine signatures.  In fact, the petition contained sixty-one signatures.
            The association noted this discrepancy in a motion to amend the judgment.[15]  Without addressing his mathematical error, the judge denied the motion on the ground that "the pages of the signed petition were not submitted with any verification, even so much as a brief sworn statement by its attorney, to support the bare assertion that [fifty-one percent] of the residents supported the [a]ssociation's purchase of the park."  However, neither verification nor a sworn statement is required.  This was the second error.
            As the Attorney General argues in her amicus letter, nothing in the act required the association to submit verification with the petition.  The act required the association to submit "reasonable evidence" to the trust.  G. L. c. 140, § 32R (c).  "Reasonable evidence" includes "a document signed by such persons."  940 Code Mass. Regs. § 10.09(3)(a) (1996).  The Attorney General has taken the position that "[t]he burden is intended to be low" and that the judge imposed an improper heightened standard in requiring the association to submit verification with the petition.  We agree with her interpretation of the statute, which is entitled to deference.[16]  See Blake v. Hometown America Communities, Inc., 486 Mass. 268, 273 (2020).  Nothing in the act required the association to submit verification with the petition, and we will not read that requirement into the act.  See Chin, 470 Mass. at 537.  Accordingly, on remand the judge must reconsider his findings on whether the association submitted to the trust reasonable evidence that the requisite number of resident owners supported the association's purchase of the park.[17]
            Crown Communities argues that we should nonetheless affirm on two separate alternative bases:  the association (1) did not submit "a proposed purchase and sale agreement or lease agreement on substantially equivalent terms and conditions" or (2) "obtain[] a binding commitment for any necessary financing or guarantees within an additional ninety days after execution of the purchase and sale agreement or lease."  G. L. c. 140, § 32R (c).
            The first argument by Crown Communities is based only on the fact that its purchase and sale agreement did not contain a mortgage contingency while the association's did.  Relying on Christian v. Edelin, 65 Mass. App. Ct. 776, 779 (2006), Crown Communities argues that it is established law that an offer with a mortgage contingency is never on substantially equivalent terms and conditions as a cash offer.  We are not persuaded.  Christian involved a different standard:  whether an offer with a mortgage contingency was on "substantially the same terms and conditions" as a cash offer (citation omitted).  Id.  Given that the right of first refusal is given to a group of generally low to moderate income individuals in order to allow them to protect their homes even when a third-party purchaser might be able to make more money converting the park to another use, financing is virtually always likely to be necessary to exercise the right of first refusal.  The inclusion of a mortgage contingency to a purchase and sale agreement by an association where the bona fide offer is for cash does not take it outside the universe of offers "on substantially equivalent terms and conditions" within the meaning of the statute.  G. L. c. 140, § 32R (c).
            As to the deadlines in the statute, before they were reached, Crown Communities recorded a memorandum of lis pendens with respect to the property.  As the association argues, and as we have held in analogous situations, a party who takes such an action, the purpose of which is precisely to hamper the sale of the property and the ability to obtain financing for it, will not be heard to complain that the statutory deadlines for those actions were not complied with.  Cf. Augis Corp. v. Massachusetts Comm'n Against Discrimination, 75 Mass. App. Ct. 398, 406 (2009) ("A party that frustrates, innocently or otherwise, another party's ability to comply with a discovery deadline has an obligation to cooperate in repairing the damage and cannot with impunity seek to capitalize on the problems its own conduct created"); Winchester Gables, Inc. v. Host Marriott Corp., 70 Mass. App. Ct. 585, 596 (2007) ("[o]ne who prevents the performance of a contract cannot take advantage of its nonperformance" [citation omitted]).
            2.  The association's counterclaims.  The association also argues error in the judgment in favor of Crown Communities on the association's counterclaims for intentional interference with contractual relations, violation of G. L. c. 93A, and violation of the MCRA.[18]
            a.  Intentional interference.  On the association's intentional interference counterclaim, the judge relied on his finding that the association did not validly exercise its statutory right of first refusal to conclude that the association did not have a purchase and sale agreement with which Crown Communities interfered.  Given the vacatur on the issue of whether the association validly exercised its statutory right of first refusal, we must also vacate the judgment on the association's intentional interference counterclaim and remand for further consideration.[19]
            b.  Violation of G. L. c. 93A.  With respect to the association's counterclaim for violation of G. L. c. 93A, the association contends that Crown Communities engaged in unfair or deceptive acts or practices to entice park residents to withdraw their support from the association.  Among other things, the association contends that (1) Crown Communities misled residents into thinking they would lose rent control protections if the association purchased the park, when the residents had no such protections in the first place,[20] and (2) Crown Communities engaged in other unfair practices such as bribery.  In support of these allegations, the association introduced documentary evidence described above showing that Crown Communities (1) warned residents that they would lose rent control protections and (2) promised financial incentives for those who "sign[ed] and return[ed] the enclosed document stating that [they] would like Crown Communities to purchase the [p]ark."
            Without addressing the association's specific allegations or the documentary evidence, the judge found that Crown Communities (1) "exerted no more pressure" than that employed by the association or CDI and (2) "did not provide misleading information to park residents and used bona fide efforts to inform and persuade."  In light of the documentary evidence discussed above, the basis for the judge's findings is not evident; at a minimum, he was incorrect that Crown Communities accurately represented the state of rent control.  Where the judge's finding gives us reason to think that his ultimate conclusion regarding Crown Communities's G. L. c. 93A liability may have rested on improper grounds,[21] we must vacate the judgment on the association's counterclaim for violation of c. 93A and remand for further consideration.
            c.  Violation of the MCRA.  Lastly, on the association's counterclaim for violation of the MCRA, the judge concluded that Crown Communities did not engage in any threatening, intimidating, or coercive conduct, as required by the MCRA.  See Pettiford v. Branded Mgt. Group, LLC, 104 Mass. App. Ct. 287, 296 (2024).  We agree.
            "To establish a claim under the MCRA, a plaintiff must prove that (1) the exercise or enjoyment of some constitutional or statutory right; (2) has been interfered with, or attempted to be interfered with; and (3) such interference was by threats, intimidation, or coercion" (quotation and citation omitted).  Pettiford, 104 Mass. App. Ct. at 296.  "[T]hreats and intimidation often rely on an element of actual or threatened physical force."  Kennie v. Natural Resources Dep't of Dennis, 451 Mass. 754, 763 (2008).  "[C]oercion is a broader category that may rely on physical, moral, or economic coercion," but it still requires the application of force necessary to "constrain [others] to do against [their] will something [they] would not otherwise have done" (quotation and citation omitted).  Id.  For example, "coercion may be found where one party deprives another of rights due under a contract."  Buster v. George W. Moore, Inc., 438 Mass. 635, 647 (2003).[22]
            Here, the association relies on economic coercion but does not argue that Crown Communities coerced park residents by withholding economic benefits to which they were entitled.  Rather, the association argues that residents were economically coerced into withdrawing their support from the association because Crown Communities (1) misled residents into thinking they would lose rent control and (2) provided financial incentives to residents.  The association has not articulated how this conduct had the same sort of coercive effect that the withholding of an economic benefit might have.  Park residents were free to reject Crown Communities's financial incentives and decide for themselves how to proceed, and the association has not pointed us to any evidence showing otherwise.[23]
            Conclusion.  So much of the judgment as entered on the counterclaim for violation of the MCRA is affirmed.  In all other respects, the judgment and the order on the motion to amend the judgment are vacated, and the matter is remanded for further consideration consistent with this opinion.
So ordered.
            RUBIN, J. (concurring).  I join Justice Vuono's excellent opinion for the court in full.  I write separately to address the question of a remand.  Of course, as an appellate court, we may not make findings of fact.  Those must be made by the trial judge in the first instance.  The one clear error of fact argued by the Pocasset Park Association (association) that is ultimately relevant to the right of first refusal claim is that the judge miscounted the number of signatures on the petition.  He said there were forty-nine, and the association argues, and we have concluded, by counting them, that there are sixty-one.
            Crown Communities, LLC (Crown Communities) does not dispute this, nor does it argue that this is a matter of indifference because there are any offsetting errors.  The judge's other factual findings about the number of (a) resident-signers who were not owners, (b) owner-signers who were not residents, (c) duplicate signatures from a single resident, and (d) rescissions, are not challenged and are adequately supported by the record.[1]  
            Although we could perhaps ourselves add twelve to the number of valid signatures the judge found, ordering judgment to enter for the association, because I agree with Justice Vuono that this may be viewed as a matter of fact finding, I join in that portion of the opinion ordering a remand.
            I also want to note that, although neither the association nor Philip Austin, as trustee of the Charles W. Austin Trust (trust), raises the question, the length of time since the association's purchase and sale agreement was signed suggests to me that G. L. c. 140, § 32R, with its tight deadline for closing, may not permit a third-party offeror to challenge the exercise of the right of first refusal by bringing a suit before closing, as Crown Communities has done, and preventing that closing from going forward at the deadline.  Cf. G. L. c. 140, § 32R (c) ("No owner shall . . . unreasonably delay the execution or closing on a purchase and sale or lease agreement with residents who have made a bona fide offer to meet the price and substantially equivalent terms and conditions of an offer for which notice is required to be given pursuant to paragraph [b]").
            The trust put the park on the market, and signed a purchase and sale agreement with the association that called for closing within 120 days, within the statutorily-mandated maximum of 180 days, see G. L. c. 140, § 32R (c), over four and one-half years ago.  At least because of the endorsed memorandum of lis pendens, and perhaps because of this lawsuit itself, the trust has been unable to sell its property, and the association, representing those protected by the statute, has been unable to buy it because of Crown Communities's actions, even though Crown Communities was aware when it made the offer of the risks inherent in the statutory first right of refusal and of the quick deadlines the statute included.  Indeed, in seeking endorsement of its memorandum of lis pendens, Crown Communities argued the endorsement was necessary precisely to prevent the statutory deadlines from being met, what it called the "clear danger the [d]efendants may transfer or encumber the [p]roperty among themselves or in relation to third-party actors (e.g., financing mechanics currently underway)."
            It may be that because of the risk to the statutory scheme's deadlines, G. L. c. 140, § 32R, should be read to allow the third-party offeror to challenge the exercise of the right of first refusal only by mechanisms that do not hold up the statutorily-mandated financing and closing deadlines, by requiring the denial of motions for endorsement of memoranda of lis pendens, or perhaps by allowing only suits brought after closing, for example suits for money damages or specific performance.  Cf. Greenfield Country Estates Tenants Ass'n v. Deep, 423 Mass. 81,85-85, 87 (1996) (specific performance was proper remedy for mobile home park owner's sale of park to third party without providing notice in violation of G. L. c. 140, § 32R, where association of fifty-five of sixty park tenants sent letter attempting to exercise their right of first refusal upon learning of sale).
 
footnotes

 
            [1] Of the Charles W. Austin Trust.
            [2] Pocasset Park Association, Inc.
            [3] Crown Communities also asserted claims against the trust for breach of contract and detrimental reliance.  Those claims are not at issue in this appeal.
            [4] The trust also filed a counterclaim requesting a declaratory judgment.
            [5] We note that the trust has not filed a brief in this appeal.  We also acknowledge the amicus letter of the Massachusetts Office of the Attorney General.
            [6] With respect to a sale that will not result in a change of use or discontinuance, an owner must provide notice of a bona fide offer under paragraph (b) "only if more than fifty percent of the tenants residing in such community or an incorporated home owners' association or group of tenants representing more than fifty percent of the tenants residing in such community notifies the . . . owner . . . , in writing, that such persons desire to receive information relating to the proposed sale."  G. L. c. 140, § 32R (b).  Crown Communities argues that the association did not request information related to the proposed sale and that, accordingly, the association was not entitled to notice under paragraph (b) and did not have the statutory right of first refusal.  This argument disregards certain critical facts.  In particular, the trust did not provide notice of the intention to sell, as required by § 32R (a), and instead skipped to providing notice of a bona fide offer under § 32R (b).  In these circumstances, it would be illogical for us to conclude that the association, which was not formed until December 23, 2019, had to request information related to the proposed sale -- a sale that the residents knew nothing about until receiving notice under § 32R (b) -- to be entitled to that very notice.  Accordingly, to the extent this argument is preserved, we reject it.
            [7] In other words, the parties agreed that subtenants who did not own their manufactured housing units were excluded from the calculation, and that owners who were not residents were also excluded.
            [8] Among other things, CDI assisted the association with obtaining a $100,000 loan through an affiliated lender, ROC USA, and some of the loan proceeds were used to hire legal counsel.
            [9] The judge found that there was "no credible evidence" regarding how many membership agreements were signed or collected.  With regard to the petition, the judge found that no effort was made "to verify whether the park residents who were asked to sign the petition were owners or simply tenants, subtenants or guest residents at the park."  The judge also found that the persons "gathering signatures were modestly aggressive."
            [10] The managing partner of Crown Communities testified that the gift cards and Crown Guarantee were not part of a quid pro quo, but the letter stated, "When we receive your signed form, we will provide you a [fifty dollar] gift card," and "Please note, in order for you to obtain the incentives listed in the 'Crown Guarantee' and for it to be applicable you need to sign and return the enclosed document."
            [11] The parties agreed at trial that the association had the burden to establish that it met the requirements to exercise its statutory right of first refusal.
            [12] "On review of a jury-waived proceeding, we accept the judge's findings of fact unless they are clearly erroneous. . . . We review the judge's rulings on questions of law de novo."  U.S. Bank Nat'l Ass'n v. Schumacher, 467 Mass. 421, 427 (2014).
            [13] This error effectively added a new requirement to the statute.
            [14] The judge did not explain on what basis a rescission could be effective under the statute after the purchase and sale agreement was signed, but for purposes of this appeal, we will assume without deciding that it could be effective.
            [15] We review an order on a motion to amend a judgment for abuse of discretion.  See Gannett v. Shulman, 74 Mass. App. Ct. 606, 615 (2009).  Here, where the judge's order on the motion to amend the judgment did not resolve the issues with the judgment, we must vacate the order and remand for further consideration.
            [16] More specifically, the Attorney General argues as follows.  "The Regulations . . . state that '"reasonable evidence . . ." shall include, without limitation, a document signed by such persons[,]' 940 [Code Mass. Regs. §] 10.09(3)(a)," and notes that the Supreme Judicial Court has equated a "reasonable evidence" standard with the "substantial evidence" standard, arguing, "[i]t is a particularly low standard to meet, as it is less burdensome than a preponderance of the evidence.  Lisbon v. Contributory Ret. Appeal Bd., 41 Mass. App. Ct. 246, 257 (1996)."  The Attorney General adds that "[n]othing in the plain text of the Statute or the Regulations suggests that a signed petition must be verified, attested to, or further explained in order to constitute evidence which a 'reasonable mind might accept as adequate.'  Med[ical] Malpractice Joint Underwriting Ass’n of Mass. [v. Commissioner of Ins.], 395 Mass. [43,] . . . 55 [1985].  On the contrary, 940 [Code Mass. Regs. §] 3.09(3)(a) provides that the universe of what may constitute 'reasonable evidence' is 'without limitation.'  And indeed, the example given in the Regulations as something that reasonable evidence 'shall include' is 'a document signed by the residents' -- nothing more.  940 [Code Mass. Regs. §] 3.09(3)(a)."
            [17] At this stage, we do not decide whether the petition satisfied the association's requirement of submitting to the trust reasonable evidence that the requisite number of resident owners supported the association's purchase of the park.  Given the judge's erroneous undercounting of the total number of signatures on the petition submitted by twelve, we are hard pressed to imagine a scenario in which the judge could conclude on this evidence that the association did not meet its burden.  Nonetheless, findings of fact must be made by the trial judge in the first instance.  If the association has met this burden, it will also have met its burden with respect to who it represents.  The Legislature cannot have meant to allow a competing putative purchaser to disrupt the right of first refusal, which requires only reasonable evidence about residents prior to the sale, by showing that, despite such evidence, the association did not, under some higher standard, in fact represent the requisite number of owner residents.
            [18] To the extent the association argues that the judgment on these counterclaims must be reversed because all three counterclaims were supported by evidence that Crown Communities filed a "frivolous" declaratory judgment action, the argument is not persuasive.  To the contrary, the record shows that there was a good faith dispute over whether the association validly exercised its statutory right of first refusal.
            [19] Nor can we affirm the judgment on the association's intentional interference counterclaim on the alternative basis that Crown Communities did not act with improper motive or means.  See Psy-Ed Corp. v. Klein, 459 Mass. 697, 715 (2011) (claim for intentional interference requires proof of interference by improper motive or means).  As we explain in our discussion of the association's counterclaim for violation of G. L. c. 93A, there is an open question regarding whether Crown Communities interfered by improper means.
            [20] As a general matter, rent control does not exist in Massachusetts.  See Quinn v. Rent Control Bd. of Peabody, 45 Mass. App. Ct. 357, 375-378 (1998) (describing history of rent control).  While there are some exceptions to this rule that permit cities and towns to adopt rent control ordinances for manufactured housing communities, see id. at 376-377, it is undisputed that the town of Bourne has not adopted any such ordinances.
            [21] We do not decide whether the statements on which the association relies were in violation of G. L. c. 93A, per se.  Providing inaccurate information and promising financial incentives may or may not rise to the level of a c. 93A violation depending on the circumstances.  The difficulty we face is that the judge appears to have thought that Crown Communities did not engage in either practice at all.
            [22] The "threat, intimidation, or coercion" element of the MCRA stands in contrast to the requirement under G. L. c. 93A of proving unfair or deceptive acts or practices.  An act or practice can be unfair or deceptive without being threatening, intimidating, or coercive.  Thus, the fact that we are vacating the judgment on the c. 93A claim does not mean that we must vacate the judgment on the MCRA claim.
            [23] There may be times that someone acts so unfairly or deceptively as to overbear someone else's will.  The association has not made that case here.
 
footnotes for concurring

 
            [1] I have serious doubt that a rescission after the purchase and sale agreement has been signed of a party's signature on the petition can have any effect on the adequacy of the signature on the petition that led to the signing of the purchase and sale agreement, but we have assumed for purposes of this appeal that it may.